# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

### *People v. Ammons*, 2021 IL App (3d) 150743

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MELVIN AMMONS JR., Defendant-Appellant. |
| District & No. | Third District<br>No. 3-15-0743 |
| Filed | September 16, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 14-CF-2458; the Hon. David Martin Carlson, Judge, presiding. |
| Judgment | Affirmed; cause remanded. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and April D. Kentala, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, David J. Robinson, and Dawn Duffy, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.<br>Justice Wright concurred in the judgment and opinion.<br>Presiding Justice McDade dissented, with opinion. |

**OPINION**

¶ 1    After a jury trial, the defendant, Melvin Ammons Jr., was convicted of aggravated battery of a police officer (720 ILCS 5/12-3.05(d)(4)(i) (West 2014)) and sentenced to three years in prison. On appeal, Ammons argues that his conviction should be reversed because (1) the trial court erred when it gave the jury instructions pertaining to resisting arrest, (2) in the alternative, the trial court instructed the jury on resisting arrest as a lesser-included offense but failed to provide complete instructions and verdict forms applicable to that offense, (3) the trial court failed to provide a supplemental instruction in response to questions that the jury submitted to the court during deliberations, (4) the prosecutor made several inappropriate remarks during his closing argument, and (5) Ammons's trial counsel rendered ineffective assistance of counsel. Ammons further argues that, if his conviction and sentence are upheld, he is entitled to credit for time served in the amount of $145.

¶ 2                                              BACKGROUND

¶ 3    On December 16, 2014, Joliet police officers David Wall and Mark Murphy were on patrol when they were informed by dispatch that an individual had fled from a traffic stop. The officers drove to the scene of the traffic stop. Joliet police officer Jeffrey Haiduke subsequently arrived at the scene. Wall heard a woman yelling "get out of here" very loudly and walked toward the direction of her voice. As he walked, Wall passed an individual, later identified as Ammons, walking on the sidewalk wearing a brown coat and a stocking cap. Wall was eventually flagged down by a woman standing at the rear door of her house, and Wall asked her why she was yelling. She responded that someone had been "hiding" or "crouching" on her porch. The woman described the individual as a "male black wearing a brown coat and black hat," and she told Wall the direction where the man went. Wall believed that the individual he had previously walked past was either the person who fled the traffic stop or someone otherwise involved in criminal activity. Wall returned to Murphy and Haiduke and explained his interaction with the woman.

¶ 4    As the three officers began to walk, they saw Ammons leaning against a fence. He was wearing a beige coat and a black and red hat. They saw two other individuals, Terry Jones and Terrance McDonald, standing behind the fence. The officers approached Ammons and asked if he had identification (ID). Officers Wall and Murphy testified that Ammons put his hands in his pocket, backed away, and stated "Yeah, I got an ID" and "Don't fucking touch me." The officers initially told Ammons to "calm down" and "get your hands out of your pockets," but Ammons "continued not complying, not producing an ID, and his hands remained inside his pockets." Wall testified that, "[b]ased on his behavior not complying, not producing an ID and being somewhat irate, I wanted his hands out of his pockets right away because I did not know what was in that front pocket area of his jacket." Wall grabbed Ammons's left wrist, and Murphy grabbed Ammons's right arm and tried to pull Ammons's hands out of his pockets. Murphy told Ammons to "relax, just take your hands out of your pockets," and Ammons responded "fuck you" and pushed his hands further down into his pockets. Ammons was very strong, and he resisted very forcefully. Wall testified that, as the officers attempted to remove Ammons's hands from his pockets and escort him to the squad car, Ammons did

> "everything from kicking his legs to twisting hard to trying to get us off of him so he could probably run or something. I don't know what his plan was but he was not

- 2 -

wanting us to touch him or get on him or anything. And at that point, you know, he was resisting arrest so we had to hold on to him and arrest him."

¶ 5        As the officers tried to get him inside, Ammons was "trying to push off the squad car" and was pulled to the ground by Wall and Murphy. Murphy testified that Ammons's head hit the ground and Murphy "probably" made contact with Ammons's head at some point during the altercation. However, Murphy stated that he did not pull Ammons's hood over his head. Haiduke stated that Ammons was flailing his arms and legs as the officers tried to restrain him. Wall stated that there was "a lot of thrashing" and that he heard people yelling at Ammons to "stop fighting, put his hands behind his back." Murphy testified that Ammons "kept trying to get up" as the officers tried to grab his limbs and that he kneed Ammons in the upper back twice to restrain him. As Murphy tried to control Ammons's right arm, Ammons bit Murphy's finger very hard through his glove. Ammons's grip caused his head to move as Murphy tried to remove his hand from Ammons's mouth. Murphy was able to slide his hand out of the glove, which remained in Ammons's teeth, and he kicked Ammons's left shoulder with his foot. During the struggle, Ammons ripped a Taser and some ammunition from one officer's uniform. Haiduke then fired his Taser into Ammons's back, and Ammons was handcuffed. Joliet police officer Benjamin Grant testified that, once Ammons was in the squad car, he was "pulling away from the backrest area like he was trying to bite—bite me or Officer Murphy, so we had to push him against the backrest while we seat belted him in." When they arrived at the police station, Ammons's emotions were "high at times," and he was uncooperative.

¶ 6        Ammons gave a very different account of the incident. He testified that the officers approached him as he was talking to McDonald and Jones. According to Ammons, initially his hands were not in his pockets, but when the officers asked if he had ID, he responded "of course," put his hands in his pockets, and asked the officers why they wanted it. The officers told him that "some lady said you were hiding under her porch." One officer began to walk behind Ammons, and Ammons turned and stated "don't touch me." Ammons believed that the officers were going to grab him, and feeling threatened, he stepped away from them. They then grabbed Ammons's arms, dragged him into the street, and took him to the ground. Murphy pulled Ammons's hood over his head, started striking his head against the asphalt, and stated "next time don't fucking run." Wall and Haiduke were holding Ammons's limbs as Murphy continued to strike Ammons's head on the ground and also kneed and kicked him "at the end." He did not remember the officers asking him to take his hands out of his pocket. Ammons felt "disrespected" and did not want to be "handled" or "grab[bed]" by the officers. Ammons admitted that he bit Murphy. However, he claimed that he did it because Murphy "had his hands on [Ammons's] head and he was striking it against the asphalt." Ammons also testified, "And he was striking my head against the asphalt and I'm yelling for him to stop, for the guys just watching to record it. The police wouldn't let them get closer, so my only defense was to bite his hand to get him off me and that's the truth." The State objected to the statement, and the trial court sustained the objection and instructed the jury to "disregard the last statement." A photo of the bite mark on Murphy's finger and a photo of the abrasions on Ammons's forehead and marks on his back from the Taser prongs were admitted into evidence.

¶ 7        Ammons was charged with aggravated battery for biting Murphy's finger. To prove Ammons guilty of aggravated battery, the State had to prove that he (1) knowingly made physical contact of an insulting or provoking nature with Murphy, (2) knew Murphy to be a peace officer, and (3) knew Murphy was engaged in the execution of his official duties.

- 3 -

¶ 8        Ammons sought to raise the affirmative defense of self-defense and asked the trial court to instruct the jury on self-defense in accordance with *People v. Sims*, 374 Ill. App. 3d 427, 428-36 (2007). The State argued that self-defense instructions should not be given, citing *People v. Wicks*, 355 Ill. App. 3d 760, 761-64 (2005). The court determined that Ammons had presented "slight" evidence to support a theory of self-defense and that a resisting arrest instruction was therefore appropriate. Over the State's objection, the trial court gave the jury the Illinois Pattern Jury Instruction on self-defense, which provides that "[a] person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force." Illinois Pattern Jury Instructions, Criminal, No. 24-25.06 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 24-25.06).

¶ 9        The State argued that, if the court gave a self-defense instruction, it must also instruct the jury on resisting arrest to support the State's theory that the officers used only the amount of force necessary to effect the arrest, not excessive force, while Ammons was resisting arrest. Ammons objected, arguing that (1) he had presented evidence that the officers had used excessive force and (2) he had been charged with aggravated battery, not with resisting arrest. The court concluded that the jury should also be instructed on resisting arrest "based upon the testimony of the officers that [Ammons] was placed under arrest" and because Ammons was taken into custody for resisting arrest. Over Ammons's objection, the trial court gave the following two pattern instructions on resisting arrest: (1) "A peace officer need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he reasonably believes to be necessary to effect the arrest or to defend himself from bodily harm while making the arrest." (see IPI Criminal 4th No. 24-25.12); (2) "A person is not authorized to use force to resist an arrest which he knows is being made by a peace officer, even if he believes that the arrest is unlawful and the arrest in fact is unlawful." (see IPI Criminal 4th No. 24-25.20).

¶ 10        After beginning deliberations, the jury sent four questions to the court. The jury asked:

"(1) Are you required to follow an officer's command?

(2) Are you required to show an ID when requested with or without cause?

(3) Can you please clarify or define the first proposition? Does it pertain to the whole incident or just the bite?

(4) What is the definition of provoke in the context of proposition one?"

¶ 11        Without objection, the trial court responded, "you have been instructed as to the law and you have heard and seen the evidence presented to you in this case. Continue your deliberations based upon that law and evidence."

¶ 12        Thereafter, the jury asked a fifth question: "Once you are put under arrest, do you have the right to defend yourself against what you think is unlawful force? If we already have this direction, please provide the sheet again." The trial court discussed this jury question with counsel for both parties. The trial court and the prosecutor agreed that the correct answer to the jury's question would be "no." The court asked the jury if it had lost or destroyed any of the instructions given to them, and the jury replied that it had not. Without objection, the court told the jury to "continue with your deliberations based on the law given to you and the instructions and the evidence presented to you during the trial."

¶ 13        After deliberating for six more hours, the jury sent out another note to the court, stating: "We were 11 to one. However, we have one juror who is creating own law [*sic*]. We have been

this way since 3:00 o'clock. Does not care about written law." Counsel and the court agreed that the jury should be given a *Prim* instruction (see *People v. Prim*, 53 Ill. 2d 62 (1972)), but before that was done, the jury sent out another note stating that it had reached a verdict.

¶ 14 The defendant was convicted. Ammons filed a motion for a new trial, arguing that the trial court erred when it gave the resisting arrest instructions over Ammons's objection. The trial court denied Ammons's motion. Ammons was sentenced to three years' imprisonment. He filed a motion to reconsider, which the trial court denied.

¶ 15 This appeal followed.

¶ 16                                    ANALYSIS
¶ 17            1. The Trial Court's Failure to Respond to the Jury's Question
¶ 18 Ammons argues that the trial court erred when it declined to respond to the jury's fifth question regarding whether a defendant has a right to defend himself against unlawful force. Ammons notes that a defendant may exercise self-defense when an officer uses excessive force, and he argues that the trial court's failure to clarify this despite the jury's obvious confusion on this issue rendered the jury unable to resolve a legal question essential to the determination of Ammons's guilt or innocence. Ammons further argues that, without additional instruction or clarification, the conflict between the resisting arrest instructions and the self-defense instructions suggested that a defendant's actions can never be legally justified when an officer uses excessive force.

¶ 19 The State argues that the trial court did not err when it declined to address the jury's question because, if the court had answered the question, it would have improperly resolved an ultimate question of law and fact that could only be answered by the jury. The State further argues that Ammons forfeited the issue because his counsel acquiesced in the trial court's response.

¶ 20 Because Ammons failed to preserve this issue, he asks us to review it for plain error. We decline to do so. The trial court chose not to clarify or further explain the jury instructions in response to the jury's question *by agreement of the parties*. Following the expressed preference of both the State and defense counsel, the trial court responded to the jury's question by telling the jury to "[c]ontinue with your deliberations based on the law given to you and the instructions and the evidence presented to you during the trial." Where a party requests or affirmatively agrees to proceed at trial in a given manner, " 'he is not in a position to claim he was prejudiced thereby.' " *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001). Plain error review of the alleged error is therefore precluded. *People v. Harding*, 2012 IL App (2d) 101011, ¶ 17; see also *People v. Carter*, 208 Ill. 2d 309, 319 (2003) ("Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error."). For this reason alone, the trial court's response to the jury's question was not error, let alone reversible plain error.

¶ 21 In any event, there can be no reversible plain error here based upon the jury's inadequate understanding of the defendant's right to defend himself from excessive force because the defendant was not entitled to a jury instruction on that defense. An arresting officer may use any force reasonably necessary to protect himself or to effectuate an arrest (*Wicks*, 355 Ill. App. 3d at 764; see also *People v. Agnew-Downs*, 404 Ill. App. 3d 218, 230 (2010)), and the officer need not retreat in the face of resistance (720 ILCS 5/7-5(a) (West 2014); *People v.*

*Haynes*, 408 Ill. App. 3d 684, 690 (2011)). A person may not use force to resist arrest by a known police officer, even if the arrest is unlawful. *Wicks*, 355 Ill. App. 3d at 763; 720 ILCS 5/7-7 (West 2014). An exception to this rule is made when the officer uses excessive force. *Haynes*, 408 Ill. App. 3d at 690; *Wicks*, 355 Ill. App. 3d at 763; *People v. Williams*, 267 Ill. App. 3d 82, 88 (1994). Use of excessive force by a police officer invokes the arrestee's right of self-defense. *Haynes*, 408 Ill. App. 3d at 690; *Wicks*, 355 Ill. App. 3d at 763. Therefore, where a defendant is charged with resisting arrest or with the aggravated battery of a police officer during an arrest, a jury instruction on self-defense is required where the defendant is unaware of the police officer's identity or there is evidence that the arresting officer used excessive force. *Wicks*, 355 Ill. App. 3d at 764; *Williams*, 267 Ill. App. 3d at 88; see also *People v. Witanowski*, 104 Ill. App. 3d 918 (1982).

¶ 22    However, a self-defense instruction should be given only "when a defendant resists arrest *after* the officers resort to using excessive force." (Emphasis added.) *Haynes*, 408 Ill. App. 3d at 691. A self-defense instruction is inappropriate where the "defendant resisted arrest and then officers used force to effectuate the arrest." *Id.*

¶ 23    Here, Ammons knew that Murphy and Wall were police officers, and he resisted the officers from the outset of his interaction with them, before either officer applied any physical force to effectuate the arrest. When Murphy and Wall approached Ammons and asked to see his ID, Ammons placed his hands in his pocket, refused to comply, and told the officers not to touch him. Concerned that Ammons might be carrying a weapon, the officers asked him to take his hands out of his pockets. Ammons refused. (He later testified that he felt "disrespected" and did not want to be "handled" or grabbed by the officers.) The officers grabbed Ammons's arms in an attempt to restrain him and get his hands out of his pockets. As Ammons continued to resist the officers, they applied escalating levels of force and eventually tased Ammons as they attempted to subdue him. Ammons testified that he bit Murphy's finger as Murphy was "striking [his] head against the asphalt" and "yelling for him to stop." According to Ammons, biting Murphy's finger was Ammons's "only defense *** to get [Murphy] off [him]." However, Ammons does not deny that he began resisting before the officers applied any allegedly excessive force and that he was still resisting arrest at the time he bit Murphy's finger. Murphy applied escalating force because Ammons continued to resist arrest, and nothing in the record suggests that Murphy would have continued applying such force if Ammons had stopped resisting. The only injuries that Ammons sustained as a result of the incident were abrasions on his forehead and Taser marks on his back.

¶ 24    Under the circumstances presented in this case, the officers were entitled to apply escalating levels of force to protect themselves and to effectuate the arrest, and a self-defense instruction based on excessive force would have been inappropriate. See, *e.g.*, *Wicks*, 355 Ill. App. 3d at 764 (holding that defendant was not entitled to a self-defense instruction where the defendant placed his hands in his pockets and refused to comply when the police asked him for identification and the police officers subsequently applied "progressive" levels of force to get the defendant to remove his hands from his pockets, including striking the defendant; ruling that, given the possibility that the defendant had a weapon, "[t]he officers were entitled to use the force required to protect themselves and effect the arrest," the progressive actions taken by the officers did not constitute excessive force, and the defendant's right to self-defense was "not triggered"); *Haynes*, 408 Ill. App. 3d at 691 (ruling that "[a] self-defense instruction is inappropriate" where a defendant resists arrest and the police officers subsequently use force

- 6 -

to effect the arrest, and holding that the defendant was not prejudiced by his counsel's failure to request a self-defense instruction where the defendant "refused to follow the officers' orders and it was only after defendant refused to cooperate with the officers by keeping her hands clenched in front of her that the officers resorted to using force"); *Agnew-Downs*, 404 Ill. App. 3d at 230 (finding no evidence of excessive force where, *inter alia*, "[t]he officers' use of greater force was in direct response to [the] defendant's actions").

¶ 25    Accordingly, even if the defendant had not invited the alleged error at issue, the trial court did not commit reversible plain error by failing to respond substantively to the jury's question about the defendant's purported right to self-defense. As shown above, the defendant had no right to a self-defense instruction because he could not show that the police officers applied excessive force before Ammons resisted.[1]

¶ 26                              2. Resisting Arrest Instruction

¶ 27    Ammons further argues that the trial court erred when it gave the jury instructions pertaining to resisting arrest (IPI Criminal 4th Nos. 24-25.12, 24-25.20). He contends that it is improper for a court to provide the resisting arrest instructions to the jury because the jury must be instructed only concerning the crime charged. Moreover, Ammons maintains that the giving of the resisting arrest instructions together with the self-defense instruction confused the jury because the jury was informed that Ammons was allowed to use force to defend himself against unlawful force but also that Ammons was not allowed to use *any* force if he was being arrested, even if the arrest was unlawful. Ammons claims that the two instructions, when considered together, suggested that defendant's actions qualified as resisting under any circumstances and that he was not allowed to use self-defense. Ammons contends that the jury's confusion was evident when it asked the court five questions during deliberations.

¶ 28    In response, the State claims that the resisting arrest instructions were necessary to provide the jury with legal principles that support the elements of the aggravated battery offense and, therefore, the trial court's decision to present the instructions to the jury was not an abuse of discretion.

¶ 29    The parties dispute the standard of review that applies to our determination of this issue. Ammons cites *People v. Parker*, 223 Ill. 2d 494, 501 (2006), which holds that this court must review *de novo* whether the jury instructions accurately conveyed to the jury the applicable law. The State maintains that the court's decision as to whether the evidence was sufficient to justify giving a jury instruction is reviewed for an abuse of discretion. We agree with the State. The parties are not asking this court to determine if the resisting arrest instruction accurately conveyed the applicable law. Rather, we are asked to determine whether the trial court's decision to give the instructions to the jury was proper given the evidence presented at trial. Regardless, Ammons's arguments would fail under any standard of review.

¶ 30    Jury instructions give the legal rules applicable to the evidence presented at trial and assist the jury during deliberations. *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). There must be some

_____

[1]Although the trial court came to a different conclusion on this issue, "we review the trial court's judgment, not its rationale," and "[w]e can affirm for any reason the record supports." *People v. Reed*, 361 Ill. App. 3d 995, 1000 (2005). Thus, it is appropriate for us to affirm the trial court's decision not to answer the jury's question for the reasons set forth above even though the court erroneously gave a self-defense instruction.

evidence in the record to justify an instruction, and instructions that are not supported by the evidence or law should not be given. *Id.* It is within the trial court's discretion to determine whether an instruction should be given. *Id.* The task of a reviewing court is to determine whether the instructions, considered together, fully and fairly articulated the law applicable to the theories presented by the State and the defense. *Id.* A trial court abuses its discretion if the jury instructions are not clear enough to avoid misleading the jury. *Id.* at 66.

¶ 31 *People v. Paez*, 45 Ill. App. 3d 349 (1977), and *People v. Witanowski*, 104 Ill. App. 3d 918 (1982), provide guidance on this issue. In *Paez*, the defendant was convicted of aggravated battery for striking two officers while the officers were placing him under arrest. 45 Ill. App. 3d at 350. On appeal, the defendant claimed that the trial court committed reversible error when it instructed the jury on resisting arrest because the instruction was irrelevant to the offense charged. *Id.* at 351. The Second District held that the court properly instructed the jury on resisting arrest because it is relevant to one of the elements of aggravated battery in that the State must show the defendant acted without legal justification and the giving of the instruction was supported by the facts presented at trial. *Id.* Furthermore, the court found that the defendant had an equal opportunity to show that he acted with legal justification when he argued that the police officers were overreacting and that he was justified in his actions. *Id.*

¶ 32 In *Witanowski*, the defendant was convicted of aggravated battery for biting two police officers. *Witanowski*, 104 Ill. App. 3d at 920. On appeal, the defendant argued that the trial court improperly instructed the jury on resisting arrest because the instruction was not necessary, given the evidence, and that the instruction was highly prejudicial. *Id.* at 922. Relying on *Paez*, this court explained that it is not improper to instruct on resisting arrest because a necessary element of aggravated assault against a police officer is that defendant acted without legal justification. The court also determined that there was evidence that the defendant resisted an arrest he knew was being made by a police officer. *Id.*

¶ 33 Similar to our appellate court's decisions in *Paez* and *Witanowski*, we find that there was evidence of resisting arrest in this case and, therefore, a resisting arrest instruction was necessary for the State to show that Ammons acted without legal justification. See *Paez*, 45 Ill. App. 3d at 351 ("[i]n a trial which involves the offense of aggravated battery against a peace officer attempting to effect an arrest it is not prejudicial error to instruct on the lack of legal justification for using force to resist the arrest when the instruction is relevant based on the facts adduced at the trial"). For instance, Officer Wall testified that, as the struggle with Ammons ensued, the officers were trying to hold him down and arrest him for resisting arrest. Ammons does not dispute the fact that he knew Wall and Murphy were police officers. Accordingly, the trial court did not abuse its discretion when it gave the jury a resisting arrest instruction.

¶ 34 3. Lesser-Included Offense

¶ 35 Ammons further contends that, by instructing the jury on resisting arrest, the trial court presented resisting arrest as a lesser-included offense to his aggravated battery charge but failed to provide the complete instructions on resisting arrest and corresponding verdict forms. The State argues that the trial court was not required to provide complete instructions and relevant verdict forms because neither party requested an instruction on the lesser-included offense of resisting arrest and the trial court did not *sua sponte* present such instruction to the jury.

¶ 36    Ammons did not request complete instructions on resisting arrest or corresponding verdict forms prior to jury deliberations. Nor did he raise this argument in a posttrial motion. Generally, a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial or does not raise the instruction issue in a posttrial motion. *Mohr*, 228 Ill. 2d at 64-65. However, Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013) states that substantial defects in criminal jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require." Rule 451(c) is coextensive with the plain error clause of the Illinois Supreme Court Rule 615(a), and both are construed identically. Therefore, we review this issue for plain error. First, we must determine whether an error occurred. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009).

¶ 37    Ammons's argument presents two questions: (1) whether resisting arrest is a lesser-included offense of aggravated battery and (2) if so, whether the trial court's failure to instruct the jury on resisting arrest as a lesser-included offense in this case was error. Generally, a defendant may not be convicted of an uncharged offense. *People v. Sanchez*, 2014 IL App (1st) 120514, ¶ 20. However, when the evidence fails to prove beyond a reasonable doubt an element of the convicted offense, a reviewing court may enter judgment on a lesser-included offense, even where the lesser-included offense was not charged at trial. *Id.*

¶ 38    In determining whether judgment may properly be entered on an uncharged lesser-included offense, the reviewing court must use the charging instrument approach. *Id.* First, the court reviews the charging instrument and determines whether the factual allegations provide a broad foundation or main outline of the lesser offense. *Id.* If the charging instrument describes the lesser offense, the court then considers whether the evidence at trial was sufficient to uphold a conviction on the lesser offense. *Id.* A defendant is entitled to a lesser included offense instruction only if an examination of the evidence reveals that it would permit a jury to rationally find the defendant guilty of the lesser offense yet acquit the defendant of the greater offense. *People v. Hamilton*, 179 Ill. 2d 319, 324 (1997). Whether an offense is a lesser-included offense of a charged crime is an issue of law that we review *de novo*. *People v. Kennebrew*, 2013 IL 113998, ¶ 18.

¶ 39    As to the first step, the factual allegations in the information provide a broad foundation of the lesser-included offense of resisting arrest. A person resists arrest when he "knowingly resists or obstructs the performance by one known to the person to be a peace officer, firefighter, or correctional institution employee of any authorized act within his or her official capacity." 720 ILCS 5/31-1(a) (West 2016). The allegations in the information similarly state that

> "defendant, knowing Mark Murphy to be a peace officer performing his official duties committed a battery in violation of Section 12-3 of the Act 5 of Chapter 720 of the Illinois Compiled Statutes, in that the defendant knowingly made physical contact of an insulting or provoking nature with Mark Murphy, in that he bit the finger of Mark Murphy."

¶ 40    As to the second step, Ammons argues that the trial court could have found him guilty of resisting arrest based on the evidence provided at trial. However, it is not conceivable that the jury would rationally acquit Ammons of aggravated battery in this case. The parties agree that Murphy was a police officer under section 12-3.05(d)(4) (720 ILCS 5/12-3.05(d)(4) (West 2014)). Also, similar Illinois cases have found that biting an officer is a physical act of an insulting or provoking nature under section 12-3.05(d)(4). See *People v. Johnson*, 2015 IL App

(3d) 130610, ¶ 27 (finding that the officer's testimony that the defendant bit him was sufficient to convict the defendant of aggravated battery against a peace officer); *People v. Hale*, 2012 IL App (4th) 100949, ¶ 31 (finding that the jury could have reasonably found the defendant guilty of aggravated battery when the defendant bit the officer's arm and the officer testified that it startled him); see also *People v. Wrencher*, 2015 IL App (4th) 130522, ¶ 39 ("[i]f the defendant resisted [the officer] by inflicting a bite injury on his finger, it is hard to see how he could have been acquitted of aggravated battery"). Therefore, we hold that Ammons was not entitled to a lesser-included offense instruction on resisting arrest, and the trial court's failure to give such an instruction was not error.

¶ 41    Even if we were to find that Ammons was entitled to a lesser-included offense instruction on resisting arrest, the trial court did not err in failing to give it because Ammons did not request such an instruction be given. With few exceptions, the trial court is under no obligation to give jury instructions *sua sponte*. *People v. Mullen*, 80 Ill. App. 3d 369, 376 (1980). " 'It is not enough merely to introduce relevant evidence. If a defendant does not articulate his theory in argument, and fails to tender jury instructions identifying it, he cannot reasonably expect the trial court, unaided, to divine his intent.' " *Id.* One of the few exceptions to the general rule that the court has no duty to issue instructions *sua sponte* is that the trial court in a criminal case, in order to afford the defendant a fair trial, bears the burden of ensuring that the jury is instructed on the elements of the crime charged, on the presumption of innocence, and on the question of burden of proof. *Id.* Here, the record shows that the jury received those instructions. The court had no duty to issue an instruction on the lesser-included offense of resisting arrest *sua sponte*.

¶ 42                    4. Improper Prosecutorial Remarks

¶ 43    Ammons argues the prosecutor made several improper remarks during closing argument. Prosecutors are given wide latitude in making closing arguments. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007); *People v. McCoy*, 378 Ill. App. 3d 954, 964 (2008). An argument that serves no purpose but to inflame the jury constitutes error. *People v. Blue*, 189 Ill. 2d 99, 128 (2000). However, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel that clearly invite response, and comment on the credibility of witnesses. *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 57. Closing arguments must be viewed in their entirety, and allegedly erroneous arguments must be viewed in context. *Id.*; *People v. Nicholas*, 218 Ill. 2d 104, 122 (2005); *People v. Pineda*, 349 Ill. App. 3d 815, 823 (2004). Reviewing courts will not focus on selected phrases or remarks in isolation but rather consider the closing argument as a whole. *Nicholas*, 218 Ill. 2d at 122; *People v. Evans*, 209 Ill. 2d 194, 225 (2004).

¶ 44    The regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion. *Blue*, 189 Ill. 2d at 128; *Pineda*, 349 Ill. App. 3d at 823. Reviewing courts will find reversible error "only if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error." *People v. Runge*, 234 Ill. 2d 68, 142 (2009). The question of whether comments made by the prosecution in closing argument are so egregious as to warrant a new trial is a question of law that we review *de novo*. *Wheeler*, 226 Ill. 2d at 121; *McCoy*, 378 Ill. App. 3d at 964.

¶ 45    Ammons did not preserve this issue for review. Accordingly, we address Ammons's claims of error under the plain error doctrine. In so doing, we employ a two-part analysis. The first step in the analysis is to determine whether a " 'plain error' " occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). The word " 'plain' " here "is synonymous with 'clear' and is the equivalent of 'obvious.' " *Id.* at 565 n.2. If we determine that the trial court committed a clear or obvious (or "plain") error, we then proceed to a second step, which is to determine whether the error is reversible. Plain errors are reversible only when (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the error is "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.* at 565; *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005).

¶ 46    We begin by determining whether an error occurred. *Lewis*, 234 Ill. 2d at 43. Ammons alleges several different types of prosecutorial misconduct. First, Ammons alleges that the prosecutor misstated the law on several occasions when he informed the jury that it was illegal to resist an arrest. The statements are as follows:

"Well, you know what, you do have to listen to police officers. That's the law. And we'll talk about the law or the law you're going to get from the judge as it relates to this case in a little bit that even talks about the fact that you cannot resist even an unlawful act of a police officer. You can't do it. Because we live in a society where you're suppose[d] to follow the law, and when an officer approaches you and asks you for your identification, you don't get in the blade stance, you don't put your hands down, you don't start to back away in an aggressive manner.

* * *

And, fourth, that the defendant was not justified in using the force which he used. And as I said, and I'll get into this in a little bit more detail in a few moments, *you cannot resist an officer*. And the defendant knew he was being arrested because he told you yesterday he was saying why are you arresting me. *And when you know you're being arrested, you can't resist. You can't even resist when somebody comes up, when an officer comes up to you and wants to talk to you.*

* * *

And you are going to be given an instruction by the judge that reads as follows: A person is not authorized to use force to resist an arrest which he knows is being made by a peace officer even if he believes that that arrest is unlawful and in fact the arrest is unlawful.

What that means, ladies and gentlemen, is you can't do what he did out there. You can't struggle with the police officers. You can't, you know, forcefully try to lift yourself back up when those police officers are trying to get control of you, and you certainly cannot bite an officer.

* * *

He made that choice to bite Officer Murphy, and you can't do that.

* * *

Put yourself in the shoes of the defendant. No, don't do that, he's on PCP and he's drunk and he's fighting with police officers. Don't put yourselves in the shoes of the defendant, ladies and gentlemen. That's not your job. Your job is to listen to the

- 11 -

evidence. To listen to what those police officers and the civilians have said. To take a look at that and compare it to the physical evidence that we have right here. To digest it, to put a little common sense onto the whole and then resolve the issue. And that path is clear. We're going to walk right down it. All of the elements of the offense to a guilty for aggravated battery to a police officer. That's what this case is about. Don't put yourself in the shoes, ladies and gentlemen, of the defendant. Listen to the evidence, be the jurors, decide based on the facts with the law that Judge Carlson give you here today.

*** [C]ertainly you all were taking your notes through the course of the trial, and collectively and individually you'll be able to rely upon those notes." (Emphases added.)

¶ 47    The prosecutor did not misstate the law during closing arguments. He correctly stated that an individual does not have legal justification to resist a police officer while he is being arrested even if the arrest is unlawful. Although *Bailey* and *Wick* provide an exception to this rule in certain circumstances when the police use excessive force, the prosecutor's failure to state this exception in his closing argument does not invalidate his statements or make them inaccurate. That is particularly so here because the excessive force exception did not apply in this case. See, *e.g.*, *Agnew-Downs*, 404 Ill. App. 3d at 230. In addition, the prosecutor's statement that the jury should not put themselves "in defendant's shoes" was not inappropriate because the statement was made in response to a comment defense counsel made during his closing argument when he asked the jury to "kind of put yourself in Melvin Ammons' shoes on December 16." As noted above, a prosecutor may properly respond to the comments made by defense counsel. *Cosmano*, 2011 IL App (1st) 101196, ¶ 57.

¶ 48    Ammons further claims that the prosecutor made several misstatements of fact. Specifically, he maintains that (1) the prosecutor incorrectly stated that Jones did not hear Ammons state that he had ID when the officers asked for it; (2) the prosecutor's comments implied that Jones, McDonald, and Ammons lied about Jones and McDonald being prevented from videotaping the incident; and (3) there is no evidence to support the prosecutor's comment that Jones and McDonald failed to "come forward" until six months after the incident because Jones and McDonald were never interviewed until six months after the incident and they did not refuse to disclose information. The comments at issue are as follows:

"Mr. McDonald and Mr. Jones, neither one of them heard the defendant say like, yeah, I got an ID, like he's going to go produce his ID when he gets into this bladed stance and he puts his hands deeper into his pockets.

* * *

And, you know, when Mr. Jones was up here the other day, he said well, darn it, I got my phone out and I started and they put those flashlights on there and I was recording it and it's like well, did you give it to anybody? Oh, you can't bring a camera phone into the courthouse. Are you kidding me? Seriously. Credibility bias, interest in testifying a particular way.

* * *

*** So if we were going to accept that proposition as being true, then you have to accept that all of the other officers that were responding to the scene were going to jump in on this conspiracy, if you will, to the point that they're going to put their lights

- 12 -

up and prevent the videotaping of this incident. But there was one videotape o[f] the incident, ladies and gentlemen, and that tape was presented by the prosecution, and that was with respect to the Taser that was used. That was the only videotape that was taken out there. I left it at home. The dog ate it. I don't know. Really?

*** [T]hose two eyewitnesses that the defense has called, it took them six months to come forward with that. Really? Your friend is so horrifically treated by the Joliet Police Department that you're going to sit on that information for six months? It's preposterous to suggest that."

¶ 49    We find no misconduct in any of these statements by the prosecutor. Jones testified that, when the officers asked Ammons if he had ID, Ammons responded, "yes, why?" Therefore, the prosecutor did misstate that fact. However, this misstatement was limited to one passing reference to Jones's testimony, and it was not repeated during the prosecutor's closing statement. Further, the statement was a small part of the prosecutor's broader argument that Jones and McDonald lacked credibility, which the prosecutor was able to establish by other means even if the statement at issue were disregarded. Moreover, the trial court instructed the jury that it, and not the attorneys, was the arbiter of the facts in the case, and it admonished the jury to disregard any statement made by counsel that was not supported by the evidence presented at trial. Thus, the prosecutor's misstatement of this fact did not rise to the level of prosecutorial misconduct under the governing legal standards (*i.e.*, it did not constitute legal error) because it could not have materially contributed to the jury's verdict. *Wheeler*, 226 Ill. 2d at 123; *McCoy*, 378 Ill. App. 3d at 964.

¶ 50    Regarding the prosecutor's comments about Jones and McDonald videotaping the incident and Jones's and McDonald's failure to "come forward" sooner, the prosecutor's comments were proper because he drew reasonable inferences from the evidence. The record shows that there is no video recording of the incident and that Jones and McDonald did not speak about the incident until a defense investigator interviewed them six months later. The prosecutor reasonably suggested that Jones and McDonald were not credible based on reasonable inferences drawn from their actions. A prosecutor may properly comment on the credibility of the witnesses during closing argument. *Cosmano*, 2011 IL App (1st) 101196, ¶ 57. Thus, we find no error here.

¶ 51    Ammons further claims that the prosecutor made multiple comments that inflamed the passions of the jury because (1) the prosecutor "inflamed the jurors' fears that if they found the defendant not guilty, they were turning their backs on the local police department, who were risking their lives for the jurors," and (2) the prosecutor "inappropriately goaded jurors with ties to Joliet *** to take personal offense at defense counsel's argument that the incident which occurred in this case would not occur in other neighborhoods." The comments are as follows:

"But our police officers each and every day when they wake up, whether they're on duty or off duty, have taken a sworn oath to protect us, the community. *** They have chosen to put theirselves [*sic*] in the way of harm to protect us. And it's kind of a damned if you do and damned if you don't proposition with the police, really, at the end of the day. Because it seems like those people in the community that want to say hey, no, the police are harassing us are going to be the first ones that are going to say, you know what, I can't find a—get a cop around here when I need one. How ironic is that?

This wouldn't happen in Naperville. It wouldn't happen in New Lenox. Really? What an insult to the people on the east side of Joliet that somehow this could only happen there in Will County. It can't happen in Naperville, it can't happen in New Lenox. What reality is that comment? But more importantly, who cares? Because you are here today collectively to decide what happened on December 16th of 2014, in the 100 block of Wallace Street with this defendant encountering three Joliet Police officers, one of them Mark Murphy, who was bit [*sic*]. That is the focus of your resolution here today."

¶ 52    We find that the prosecutor's remark about the people of the east side of Joliet was not improper. The prosecutor was responding to the remarks made by defense counsel and was pointing out the irrelevance of the statement before the jury. See *Cosmano*, 2011 IL App (1st) 101196, ¶ 57 (prosecutor may properly respond to comments made by defense counsel which clearly invite response).

¶ 53    Nor were the prosecutor's remarks about the role of the police in the community improper. The prosecutor's discussion of this issue amounted to a single, passing reference to the fact that the police take an oath to protect the community. The comment was not inflammatory, and it did not play on the jury's fears. For example, it did not suggest that the jurors would personally suffer adverse consequences if they did not support the police in this case. Further, the prosecutor never repeated the comment, and it did not play an appreciable role in the prosecutor's argument. Thus, the comment did not fall outside the wide latitude given to a prosecutor on closing argument. See, *e.g.*, *People v. Dalcollo*, 282 Ill. App. 3d 944 (1996); *People v. Lovelace*, 251 Ill. App. 3d 607, 624 (1993); *People v. Williams*, 228 Ill. App. 3d 981, 997-1007 (1992).

¶ 54    In arguing that the prosecutor's comments about the police constituted reversible error, the dissent relies upon our supreme court's decision in *People v. Johnson*, 208 Ill. 2d 53 (2003), and argues that our ruling "disregards" *Johnson*. However, *Johnson* is readily distinguishable. The comments that the prosecutor made about the police in *Johnson* were pervasive, highly inflammatory, and substantially prejudicial, particularly when viewed in the context of multiple other instances of improper, prejudicial conduct that the prosecutor committed throughout the trial. For example, the prosecutor used the "bloodied and brain-splattered uniform" of the police officer of whom the defendants had been accused of murdering, and a life-sized, headless mannequin to display the torn and bloodied uniform. *Id.* at 72-73. Both were later taken into the jury room. The prosecutor also relied upon (1) emotionally charged and completely immaterial testimony of the murdered police officer's father regarding the pain and loss experienced by the family as a result of his untimely death and (2) inflammatory and irrelevant testimony of the murdered police officer's supervising officer, who testified regarding both the oath of office originally taken by the murdered officer and the fact that the murdered officer's badge had been retired and placed on display in the " 'honored star case' " at Chicago Police Department headquarters. *Id.* at 74. Then, during closing arguments, the prosecutor encouraged the jury to " '[t]hink about [the] message' " that a not guilty verdict would send to the law enforcement community (*id.* at 77) and exacerbated the prejudicial impact of this exhortation by merging his position as prosecutor with the jury, the society, and the community. (The prosecutor stated " '[w]e don't have to allow that to happen in our community. \*\*\* We as a people can stand together \*\*\*.' " *Id.* at 79.) In granting some of the

defendants' requests for a new trial, our supreme court held that the cumulative errors and the pervasive pattern of unfair prejudice caused by the prosecutor's misconduct denied the defendants a fair trial and cast doubt upon the reliability of the judicial process. *Id.* at 84, 87.

¶ 55      In this case, the prosecutor's single, isolated, and innocuous remark about the police is a far cry from the pervasive prosecutorial misconduct addressed in *Johnson*. The prosecutor in this case merely noted that the police put themselves in harm's way to protect the community. He did not ask the jury to send a "message" to the law enforcement community or to the community at large. There was no pattern of prosecutorial misconduct or highly inflammatory and irrelevant evidence in this case that would have compounded the allegedly prejudicial impact of the remark at issue. Accordingly, *Johnson* is distinguishable and inapposite. See *Nicholas*, 218 Ill. 2d at 123 (holding that comments made by the prosecutor in closing arguments did not constitute reversible error where, "[u]nlike the remarks at issue in *Johnson*, the [prosecutor's] remarks here were isolated" and "did not add their weight to a cloud of prejudice formed by a wider array of prosecutorial misconduct"); see also *People v. Long*, 2018 IL App (4th) 150919, ¶¶ 63, 65 (distinguishing *Johnson* where prosecutor's reference to the community, which the defendant argued engendered an improper " 'us-versus-them' " mentality in the minds of the jury, "f[e]ll far short of what occurred in *Johnson*"); *People v. Desantiago*, 365 Ill. App. 3d 855, 865 (2006) (affirming defendant's conviction and distinguishing *Johnson* where the prosecutor did not ask the jury to send a message to the community and where the prosecutor's " 'us-versus-them' " rhetoric during closing arguments, when viewed in the context of the trial as a whole, "did not rise to the level of prosecutorial misconduct proscribed by our supreme court in *Johnson* and did not prejudice defendant").

¶ 56      Ammons relies upon a handful of cases in which our appellate court has held that a prosecutor's statements supporting the police during closing argument amounted to improper and reversible misconduct. However, these cases are distinguishable. In *People v. Threadgill*, 166 Ill. App. 3d 643 (1988), the prosecutor (1) repeatedly suggested that "the decision of the jurors in the case would indicate whether they supported their police officers who were out protecting them, and that their decision would affect what the police felt as far as support from the jurors," which implied that "a not guilty verdict was tantamount to not supporting law enforcement in the community"; (2) attempted to "inflame the jurors' fears that if they found the defendant not guilty, they were turning their backs on the Freeport [P]olice [D]epartment, who were risking their lives for the jurors"; and (3) made the matter deeply personal for the jurors by stating that the police were " '*out there trying to protect you and your family*' " and were " '*putting their lives on the line for you*' " and by telling the jurors that " 'you can either follow up on that and back them up or you can turn your back on them.' " (Emphases in original and omitted.) *Id.* at 648-49, 651.

¶ 57      In this case, by contrast, the prosecutor made only a single reference about the police, and that reference was not a personal appeal to the jurors. Nor was it inflammatory or threatening to the jurors. The comment did not personalize the matter for the jury by suggesting that their verdict would be a test of their support of the police or play on the jurors' fears by suggesting that a verdict in the defendant's favor would affect how the police felt about them. See *Lovelace*, 251 Ill. App. 3d at 624 (holding that the prosecutor's single comment regarding the police was distinguishable from the comments at issue in *Threadgill*, in which the prosecutor made "repeated attempts to arouse the jury's passions in a personalized way"); *Williams*, 228 Ill. App. 3d at 1003 (distinguishing *Threadgill* where, *inter alia*, the prosecutor's comments at

issue "were not repeated and lengthy arguments made throughout the State's closing argument").

¶ 58    Ammons also relies on *People v. McCollum*, 239 Ill. App. 3d 593 (1992), and *People v. Slabaugh*, 323 Ill. App. 3d 723 (2001), both of which are inapposite. In *McCollum*, 239 Ill. App. 3d at 600, the prosecutor stated that the defendant's investigator made far more money than the police officers and aligned himself with the local police by referring to " 'us poor old country boys in Hancock County.' " In *Slabaugh*, 323 Ill. App. 3d at 731, the prosecutor's repeated comments were "intended to focus the jury's attention away from the evidence by turning its deliberations into a referendum on local law enforcement." The single, isolated comment made in this case was neither as personalized nor as inflammatory nor as pervasive as the comments made in those cases.

¶ 59    In any event, even if we were to find a clear and obvious error on this issue, we would not find the error to be reversible under the plain error doctrine. Ammons maintains that the alleged error by the prosecutors is reversible under both prongs of the plain error doctrine. He argues that the evidence was closely balanced because the case turned on a credibility contest between the testifying police officers and Ammons's witnesses. Moreover, he contends that the prosecutor's improper comments constituted structural error under the second prong because they deprived him of a fair trial.

¶ 60    We disagree. The evidence presented in a case is not deemed to be closely balanced merely because it turns on conflicting witness testimony. "[A] reviewing court must undertake a commonsense analysis of all the evidence in context when reviewing a claim under the first prong of the plain error doctrine." *People v. Belknap*, 2014 IL 117094, ¶ 50; see also *People v. Adams*, 2012 IL 111168, ¶ 22; *People v. White*, 2011 IL 109689, ¶ 139 (where defendant claimed the evidence was so closely balanced that it necessitated review of an error, the court held that a qualitative—as opposed to strictly quantitative—commonsense assessment of the evidence demonstrated it was not). In this case, a qualitative review of the evidence indicates that the testimony of the police officers was more credible than that of the defendant and the other defense witnesses.

¶ 61    Ammons also fails to demonstrate reversible error under the second prong of the plain error doctrine. As noted above, almost all of the prosecutor's comments were entirely proper, and the very few that were problematic were harmless when considered in the context of the entire trial. They certainly did not deprive Ammons of a fair trial or undermine the integrity of the judicial process.

¶ 62    The dissent maintains that the evidence in this case was closely balanced because the State and Ammons had "conflicting theories about whether Ammons bit Murphy with or without legal justification" and they raised conflicting arguments on this issue. *Infra* ¶ 83. However, the fact that the parties have different theories of the case and advance opposing arguments has nothing to do with the closeness of the evidence. If it did, the evidence would be deemed closely balanced in every case. The dissent further suggests that the evidence was closely balanced because Ammons's account of the incident and his justification argument were "credible" and because the State presented " 'no extrinsic evidence' " corroborating its own argument or contradicting Ammons's argument. *Infra* ¶ 84. However, the jury did not find Ammons's account to be credible, and it could have properly chosen to credit the officers' testimony over Ammons's based on a qualitative assessment of the testimony. We cannot say that the jury's credibility findings were unreasonable or against the manifest weight of the

- 16 -

evidence. Accordingly, the fact that the parties presented conflicting accounts of the incident does not compel the conclusion that the evidence was closely balanced, even if the State presented no additional extrinsic evidence corroborating the officers' testimony. In addition, as noted above, Ammons's argument that his use of force was justified in order to defend himself from Murphy's use of excessive force has no basis in law.

¶ 63   The dissent also discusses the "thin blue line" flag designed to signal support for police officers and contends that the community's support for law enforcement "is, at times, of such magnitude that even a slight indication that a given position is not favorable to law enforcement is enough to incite passion or outrage." (Emphasis omitted.) *Infra* ¶ 82. There is currently a widespread distrust of, and often antipathy toward, the police by many in the community, particularly in the wake of the killing of George Floyd. Although these negative feelings toward the police were not as acute or pervasive at the time of Ammons's trial, they were certainly common in some quarters then. The riots and the Black Lives Matter protests in Ferguson, Missouri, following the shooting death of Michael Brown occurred prior to Ammons's trial. Accordingly, the dissent's assertion that the community's support for law enforcement is so universal and unqualified that any slight suggestion that Ammons's position was unfavorable to law enforcement would likely have inflamed and outraged all members of the jury is disingenuous.

¶ 64                                5. Ineffective Assistance of Counsel

¶ 65   Ammons contends that his defense counsel rendered ineffective assistance when he (1) did not provide an answer to the fifth question posed by the jury, (2) failed to object to the prosecutor's alleged inappropriate remarks, and (3) failed to seek clarification of the court's instruction to disregard the "last statement" of Ammons's testimony that Murphy continuously struck Ammons's head on the asphalt and that Ammons's only defense was "to bite [Murphy's] hand to get him off me and that's the truth."

¶ 66   A claim alleging ineffective assistance of counsel is governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *People v. Veach*, 2017 IL 120649, ¶ 30. Specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. *Id.* A defendant must satisfy both prongs of the *Strickland* test, and a failure to satisfy either one of the prongs precludes a finding of ineffectiveness. *Id.*

¶ 67   Ammons's claims of ineffective assistance fail because Ammons cannot demonstrate that he was prejudiced by any of his counsel's alleged errors or omissions. The fifth question posed by the jury concerned the scope of a defendant's purported right to self-defense in a case involving the use of excessive force by an arresting officer. As we showed in our analysis of the first issue, Ammons was not entitled to a self-defense instruction because he could not show that the police officers applied excessive force before Ammons resisted arrest. Because Ammons had no right to raise the defense of self-defense under the evidence presented, he was not prejudiced by his counsel's failure to provide clarification on the scope of that right. See *Haynes*, 408 Ill. App. 3d at 691. For the same reason, Ammons cannot demonstrate prejudice

from his counsel's failure to seek clarification as to the scope of the trial court's limiting instruction directing the jury to disregard the "last statement" of Ammons's testimony regarding his motive for biting Murphy's finger in self-defense. Further, as we showed in our analysis of the prosecutor's closing argument, all but one of the challenged statements made by counsel during closing argument were proper, and none of them could justify reversal of the defendant's conviction. Accordingly, Ammons's trial counsel's failure to object to those statements did not prejudice the defendant, and Ammons cannot establish ineffective assistance of counsel on that basis.

¶ 68                                6. Court Fines

¶ 69     Lastly, Ammons argues that certain fines imposed by the trial court should be offset by his $5-per-day credit for time served. The State concedes that Ammons is entitled to an offset against some, but not all, of the fines imposed by the trial court.

¶ 70     While this case was pending on appeal, our supreme court adopted Illinois Supreme Court Rule 472, which provides that the trial court retains jurisdiction to correct sentencing errors in the imposition or calculation of fines, fees, assessments, or costs at any time following judgment on the motion of any party. Ill. S. Ct. R. 472(a)(1) (eff. Mar. 1, 2019). Rule 472(c) states that no appeal may be taken from a judgment of conviction on the ground of any sentencing error unless the error was first raised in the trial court. Ill. S. Ct. R. 472(c) (eff. Mar. 1, 2019). Subsequently, on May 17, 2019, Rule 472 was amended to provide that

> "[i]n all criminal cases pending on appeal as of March 1, 2019, or appeals filed thereafter in which a party has attempted to raise sentencing errors covered by this rule for the first time on appeal, the reviewing court shall remand to the circuit court to allow the party to file a motion pursuant to this rule." Ill. S. Ct. R. 472(e) (eff. May 17, 2019).

¶ 71     This appeal was pending on appeal as of March 1, 2019. Moreover, the sentencing errors the defendant raises are governed by Rule 472, and the defendant has raised these alleged errors for the first time on appeal. We therefore remand the issue to the trial court to allow defendant to file a motion pursuant to Rule 472(e). See *People v. Hinthorn*, 2019 IL App (4th) 160818, ¶¶ 98-100; *People v. Eason*, 2020 IL App (3d) 180296, ¶¶ 14-15; *People v. Edwards*, 2020 IL App (1st) 170843, ¶ 27; *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 98. If the defendant files such a motion, we direct the trial court to consider the information contained in the appendix to our decision in *People v. Johnson*, 2015 IL App (3d) 140364, when recalculating any monetary components of its judgment order.

¶ 72                                CONCLUSION

¶ 73     For the foregoing reasons, we affirm Ammons's conviction for aggravated battery of a police officer and remand the cause in accordance with Illinois Supreme Court Rule 472(e) (eff. May 17, 2019).

¶ 74     Affirmed; cause remanded.

¶ 75    PRESIDING JUSTICE McDADE, dissenting:

¶ 76    I concur with the findings of the majority that the trial court (1) did not abuse its discretion by giving a jury instruction on the law of resisting arrest, (2) had no duty to *sua sponte* issue an instruction for a lesser-included offense of resisting arrest, and (3) did not commit plain error in refusing to answer the jury's fifth question. However, because the prosecutor made improper and prejudicial comments during the State's closing arguments and because trial counsel was ineffective, I respectfully dissent from the affirmance of his conviction. I would vacate Ammons's conviction and remand the cause for a new trial. I do not, therefore, reach the sentencing issue.

¶ 77                              I. Improper Prosecutorial Remarks

¶ 78    The majority finds no error in the State's remarks about the role of the police in the community on the ground that they were neither "repeated" nor suggestive of personal "adverse consequences" to the jurors "if they did not support the police in this case." The majority's reasoning is problematic, not solely because it encourages prosecutors to edge right up to the line of propriety but also because it disregards our supreme court's ruling in *People v. Johnson*, 208 Ill. 2d 53 (2003). I find these remarks were improperly intended to inflame the jurors' emotions and cause them to convict the defendant based on an emotional appeal for support of the police officers rather than the evidence in the case.

¶ 79    In *Johnson*, two of the defendants were tried for and convicted of first degree murder and two counts of attempted murder, with additional separate convictions, and one defendant was convicted of first degree murder and additional convictions. *Id.* at 61-62. One of the victims was " 'a 40 year old rookie police officer.' " *Id.* at 75. At its outset, the State's argument described him as " 'hero' " who " 'risked his life *** to serve and to protect the people.' " *Id.* The supreme court found the prosecutor's description of the officer to be an improper "emotional appeal." *Id.* at 76. The *Johnson* court also found that the prosecutor's arguments "were clearly intended to" arouse "the jury's passion and outrage." *Id.* Specifically, the State reminded the jurors that the day started with the officer who, only months earlier, was " 'sworn in to be a police officer for us, to serve us, and to protect us' " and ended with " 'a 40 year old hero fall[ing] to the ground.' " *Id.* The court also found the comments created a "dichotomous presentation," by placing the prosecutor among the jurors and stating: " 'We do not have to accept their values. We don't have to allow that to happen in our community. *** We as a people can stand together ***.' " *Id.* at 76, 79.

¶ 80    It is critical to remember that it is the compromise of due process, *not* the egregious, outrageous, or repetitious manner of its accomplishment that constitutes the core and gravity of the offense the defendant challenges. The *Johnson* court reasoned that the closing argument "was likely calculated to avoid the appearance of urging the jurors to use their verdict to send a message of support to the police, a tactic that [the] court deemed improper in [*People v.*] *Blue*, 189 Ill. 2d [99,] 133 [(2000)]." *Id.* at 76. Sidestepping that calculus, the court found that the "arguments [sought] to engender an 'us-versus-them' mentality that [was] *** inconsistent with the inherent principles of the criminal trial process." *Id.* at 80 (citing *People v. Thomas*, 146 Ill. App. 3d 1087, 1089 (1986)). Instead, the court reaffirmed the rule that prosecutors should limit their closing arguments to the jury's duty to consider the guilt or innocence of the individual defendant. *Id.* at 79. Prosecutors should not depart from this task by "interject[ing] matters that have no real bearing upon the case at hand, [or by] seek[ing] to incite the jury to

act out of undifferentiated passion and outrage, rather than reason and deliberation." *Id.* Jurors are called upon to be " 'nonpartisans who function under the presumption that a defendant is innocent until proved otherwise.' " *Id.* at 80 (quoting *Thomas*, 146 Ill. App. 3d at 1089).

¶ 81    Nothing in *Johnson*'s reasoning requires that the statements be "repeated" or that they suggest personal "consequences" for the jurors. Nor should we require such findings in the case before us. The State's remarks in this case have the same qualities found improper in *Johnson*. First, the comments engendered an "us-versus-them" mentality and asked the jurors to place the officers in with "us" and Ammons in with "them." The prosecutor stated: "But our police officers each and every day when they wake up, whether they're on duty or off duty, have taken a sworn oath to protect us, the community. *** *They have chosen to put theirselves [sic] in the way of harm to protect us.*" (Emphasis added.) Second, the State further appeals to emotion by describing the officers as operating in a Catch-22 scenario. Specifically, it presented the officers as in a thankless position regardless of what they do: "And it's kind of a *damned if you do and damned if you don't* proposition with the police, really, at the end of the day." (Emphasis added.) Third, it creates a dichotomous presentation between Ammons's argument and that of law enforcement supporters: "Because it seems like *those people* in the community that want to say hey, no, the police are harassing us are going to be the first ones that are going to say, you know what, I can't find a—get a cop around here when I need one." (Emphasis added.) And finally, it sought to incite the jurors' passion and outrage by deriding Ammons's attitude: "*How ironic is that?*" (Emphasis added.)

¶ 82    The majority concludes the quoted comments were not "a personal appeal to the jurors" (*supra* ¶ 57). I disagree. It is now commonplace for shirts and bumper stickers to have *thin blue line* flags to signal their supports for police officers. Such flags are designed like the flag of the United States of America but have white stars on a field of black with black and white stripes. A thin blue stripe runs vividly through the center of the flag, below the field of stars, to show support for law enforcement. This support is, at times, of such magnitude that even a slight indication that a given position is not favorable to law enforcement is enough to incite passion or outrage. A prosecutor need not make an actual, personal appeal to suggest that police officers stand as a thin blue shield between "us and them." Nor is a juror required to feel personally at risk before making that leap. The tactic employed in Ammons's case was designed to avoid such overt signposts. The majority's reasoning, upholding tactics previously deemed improper in *Blue*, both undermines and evades our supreme court's holding in *Johnson*.

¶ 83    I would conclude that plain error can be found on this issue under either prong. I believe the error, as described by the supreme court in *Johnson*, was so serious that it affected the fairness of the trial and the integrity of the judicial process. See, *e.g.*, *Thomas*, 146 Ill. App. 3d at 1089 (finding plain error without regard to the closeness of the evidence because the improper "argument *** diminishe[d] the presumption of innocence"). I also find the evidence was closely balanced. The undisputed evidence shows that Ammons bit Murphy's finger while the officers were forcibly restraining him. However, the parties have credible, conflicting theories about whether Ammons bit Murphy with or without legal justification, an essential element to proving aggravated battery of a police officer. The State argues that Ammons did not have legal justification because it is illegal for an individual to resist arrest even if the arrest is unlawful. Ammons counters that he was legally justified because Murphy was using

excessive force by repeatedly striking Ammons's head against the pavement, allowing him to protect himself from serious injury or death.

¶ 84     I do not suggest that Ammons's argument that he bit Murphy would have carried more weight absent the prosecutor's improper remarks. However, because his argument is credible and because the State presented "no extrinsic evidence" corroborating its own argument or contradicting his argument, Ammons also met the first prong of plain error review. See *People v. Sebby*, 2017 IL 119445, ¶ 63 (finding the evidence closely balanced where both versions of events are credible with " 'no extrinsic evidence *** to corroborate or contradict either version' "). The majority attacks this conclusion, noting that the trial court (or the jury in this case) "did not find Ammons's account to be credible, and it could have properly chosen to credit the officers' testimony over Ammons's based on a qualitative assessment of the testimony." *Supra* ¶ 62. However, we do not know this to be true. The majority conflates two distinct evaluations. The jury's decision on the issue of the defendant's culpability is driven in large measure by the perceived credibility of the witnesses themselves. By contrast, under *Sebby*, we are called upon to determine whether, absent the individual character of the witnesses, the *accounts* presented in their testimony can be maintained as true. See *Sebby*, 2017 IL 119445, ¶ 61 (finding both accounts credible where "neither the prosecution nor the defense accounts of [the] events were fanciful"). If the answer is yes, then the evidence is closely balanced. *Id.* ¶ 63. In the case before us, I find that Ammons's account of the events was no less credible than the account present by the State's witnesses. Therefore, I would find reversible plain error on either basis.

¶ 85                       II. Ineffective Assistance of Counsel

¶ 86     I agree with the majority that Ammons cannot demonstrate that he was prejudiced by his counsel's alleged error regarding the fifth jury question posed during deliberations. However, I disagree with the majority on whether counsel was ineffective in failing to object to the prosecutor's alleged inappropriate remarks and failing to seek clarification on the court's instruction to disregard Ammons's last statement following his testimony. Therefore, I would also remand the case for a new trial on this issue.

¶ 87     Regarding the prosecutor's improper closing remarks, my analysis above, grounded in *Johnson* and *Thomas*, compels a finding that defense counsel's failure to object to them was deficient performance. Regarding counsel's failure to seek clarification of the court's ruling, Ammons had testified as follows:

> "[DEFENSE COUNSEL]: Melvin, at any point did you bite Officer Murphy?
>
> [THE DEFENDANT]: Yes.
>
> [DEFENSE COUNSEL]: Tell me why.
>
> [THE DEFENDANT]: Because he had his hands on my head and he was striking it against the asphalt. And David Wall had this arm Jeffrey Haiduke had [t]his leg, and he had my other arm, Mark [Murphy] (indicating). And he was striking my head against the asphalt and I'm yelling for him to stop, for the guys just watching to record it the police wouldn't let them get closer, so my only defense was to bite his hand to get him off me and that's the truth.
>
> [DEFENSE COUNSEL]: All right.
>
> [PROSECUTOR]: Objection.

THE COURT: Sustained. You'll disregard the last statement."

¶ 88    The majority concludes that Ammons cannot demonstrate prejudice from counsel's failure to seek clarification because he had no right to a self-defense instruction. The majority's reasoning conflates the deficient performance prong with the prejudice prong. To prevail on a claim of ineffective assistance of counsel, Ammons must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced him. *People v. Veach*, 2017 IL 120649, ¶ 30. Counsel's performance is deficient when it is objectively unreasonable under prevailing professional norms. *Id.* Counsel's performance was deficient because it was unclear whether the trial court was directing the jury to disregard Ammons's whole statement or just the last clause of that statement.

¶ 89    A defendant is prejudiced by his counsel's performance when there is a reasonable probability that, but for counsel's performance, the results of the proceeding would have been different. *Id.* A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. *Id.* The majority's finding of no prejudice is sustainable only if we disregard Ammons's testimony in its entirety. Taking the jurors as laypersons, we cannot say to what extent they understood that the trial court's instructions were limited to correcting a specific impropriety in Ammons's statement or of withdrawing the whole of his response from consideration. The jury could well have found that a human being has no obligation to passively allow another person to kill or maim him just because that person is wearing a uniform and is placing him under arrest. Therefore, there is no way to say that they would not have arrived at a different outcome.