2023 IL App (2d) 200657-U
No. 2-20-0657
Order filed December 7, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-793 |
| ERIC E. ERICSON, | ) ) | Honorable Donald Tegeler Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Jorgensen and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant forfeited review of his claim that COVID-19 restrictions on the public's access to the courtroom violated his right to a public trial, and he forfeited review of his motion for a directed verdict. Defendant's statutory speedy trial rights were not violated. The trial court did not err in denying defendant's request to provide a self-defense instruction to the jury. The trial court did not abuse its discretion in refusing to continue trial in order to secure attendance of absent defense witness, and in refusing to allow defendant to call the chief of police as witness. Finally, the trial court did not err in providing pattern jury instruction in response to jury's question during deliberation. Affirmed.

¶ 2    Defendant (*pro se*) appeals his convictions for aggravated battery of a peace officer (720

ILCS 5/12-3.05(d)(4) (West 2018)) and resisting arrest (720 ILCS 5/31-1(a) (West 2018)).

Defendant's trial was delayed as a result of the COVID-19 pandemic, and the public's access to the courtroom during trial was restricted. On appeal defendant argues that (1) the court's COVID-19 restrictions violated his right to a public trial, (2) his statutory speedy trial rights were violated in spite of the supreme court's administrative order allowing the circuit courts to suspend trials, (3) the trial court erred in failing to provide the jury with a self-defense instruction, (4) the trial court erred in denying his motion for a directed verdict, (5) the trial court denied him his right to call witnesses in his defense when it did not continue the trial in order to locate a missing witness or allow him to call the chief of police as a witness, and (6) the trial court erred in answering a question from the jury by providing them with an instruction form the Illinois Pattern Jury Instructions, Criminal (IPI) rather than answering the jury's specific question. For the following reasons we affirm the judgment of the trial court.

¶ 3                                    I. BACKGROUND

¶ 4        On April 30, 2019, police officers arrested defendant pursuant to a warrant relating to a violation of the terms of his sentence in a prior stalking no contact order case (*People v. Ericson*, No. 17-CM-1331 (Cir. Ct. Kane County)). On May 7, 2019, while in custody, defendant filed a demand for a speedy trial pursuant to 725 ILCS 5/103-5(a) (West 2018). Defendant was subsequently released on bond and filed a second demand for a speedy trial pursuant to 725 ILCS 5/103-5(b) (West 2018) on July 30, 2019.

¶ 5        On September 25, 2019, defendant filed a *pro se* motion to "be appointed co-counsel or represent himself." Up until this point, defendant had been represented by the public defender's office. A hearing was held on defendant's motion on October 3, 2019, and defendant was allowed to proceed *pro se*.

¶ 6     Following several delays, some attributable to the State and some to defendant, a trial date of April 27, 2020, was set.

¶ 7     On March 17, 2020, the supreme court entered its first administrative order regarding the court's response to the COVID-19 pandemic. Ill. S. Ct., M.R. 30370 (eff. Mar. 17, 2020). On March 20, 2020, the trial court issued a second administrative order regarding the COVID-19 pandemic, which read in pertinent part,

> "IT IS HEREBY ORDERED that the Chief Judges of each circuit may continue trials for the next 60 days and until further order of this Court. In the case of criminal proceedings, any delay resulting from this emergency continuance order shall not be attributable to either the State or the defendant for purposes of section 103-5 of the Code of Criminal Procedure of 1963 [citation]." *Id.* (eff. Mar. 20, 2020).

On March 25, 2020, pursuant to our supreme court's order of March 20, 2020, the circuit court of Kane County entered an order continuing trials for 60 days from March 20, 2022. 16th Judicial Cir. Ct. G.O. 20-09 (Mar. 25, 2020). On April 7, 2020, our supreme court entered another administrative order, allowing the chief judges of the circuit courts to continue trials until further order of court. Ill. S. Ct., M.R. 30370 (eff. Apr. 7, 2020). On April 22, 2020, the circuit court of Kane County entered an order further continuing felony trials pursuant to our supreme court's April 7, 2020, order. 16th Judicial Cir. Ct. G.O. 20-09 (Apr. 22, 2020).

¶ 8     On June 3, 2020, defendant filed a motion to dismiss the charges against him, arguing that his right to a speedy trial had been violated. A hearing was held on defendant's motion on June 10, 2020. The trial court found that as of the supreme court's administrative order entered on March 20, 2020 (Ill. S. Ct., M.R. 30370 (eff. March 20, 2020)), only 150 days had elapsed from the

applicable 160-day term on defendant's speedy trial demand, and it denied defendant's motion based on the tolling provisions of the supreme and circuit court's orders. On appeal, defendant accepts the trial court's calculation that 150 days had elapsed on his speedy trial demand as of March 20, 2020.

¶ 9    The matter proceeded to trial on August 3, 2020.

¶ 10    The State began by calling Detective Rick Murawski, who testified as follows. On April 30, 2019, Murawski was a uniformed patrol officer with the City of St. Charles Police Department. At around 8:50 p.m., Murawski was in the area of 1409 South Fourth Street in St. Charles. Murawski was aware that a warrant had been issued for defendant's arrest, and that defendant lived at 1409 South Fourth Street, so he decided to canvas the neighborhood to try and locate defendant. He had not previously met defendant, but he did have a physical description.

¶ 11    The first house Murawski visited as part of his canvas was 1403 South Fourth Street, which was the house immediately north of 1409. Murawski knocked at the door, and Justina Engel answered. Murawski was in full police uniform. He advised Justina that he was with the St. Charles Police Department and was looking for the man who lived at 1409. She responded that he was her landlord, and was in the basement fixing the washer and dryer. Murawski asked if he could speak with him, and Justina called for her father, Leland Engel. When Leland came to the door, Murawski identified himself as a police officer and told Leland he needed to speak with defendant. Leland said to hold on and that he would go and get defendant. Leland then walked into the rear of the residence. Murawski asked Justina if he could enter the home, and she said yes. He then entered the living room to wait for Leland to bring defendant.

¶ 12    While waiting in the living room, Murawski heard a loud voice yell from the basement, "Tell him to get the fuck out of my house." Murawski radioed for backup and went into the

basement. As he went into the basement, he saw that the backdoor was closed. Murawski went about halfway down the stairs and stopped on the landing. Defendant, Leland, and Jamie Engel, Leland's son, were downstairs. Murawski identified himself as a St. Charles police officer, and he told defendant that he had a warrant for his arrest and to come upstairs. Defendant responded, "I'm not going anywhere with you." Defendant had his hands balled up by his side and was visibly upset. Murawski decided to wait for backup to arrive and went back upstairs. Officer Steve Woloszyk radioed that he was on the scene, and Murawski went towards the front door to let him in. Leland then came up the stairs and told Murawski to get out of his house. Murawski told Leland he was not going to leave.

¶ 13 Leland then went back towards the basement. Murawski was waiting for Woloszyk when he heard quick footsteps coming up the basement stairs. Murawski went back towards the basement stairs. The door to the basement was now closed; Murawski had left it open. He opened the door, and Leland was standing there. Murawski asked where defendant had gone, and Leland replied, "I don't know." Murawski observed that the back door was wide open, and he went outside to look for defendant.

¶ 14 Murawski used a flashlight to look around the yard but did not see defendant. Murawski then went to look behind a small tool shed that was near the back of the house. As he turned the corner to look behind the shed, he saw defendant in a crouched position about two feet away from him. Murawski told defendant to stop and that he was under arrest. Defendant got up from his crouched position and "stiff armed" Murawski in the face below his left eye. He described the blow as a "good shot, it was pretty hard. It hurt." However, Murawski did not suffer any bleeding or bruising.

¶ 15     Defendant then tried to run away towards his home. Murawski caught up with defendant before he could leave the yard, and grabbed his arms. They both then went to the ground. Defendant laid on his stomach, and Murawski was to defendant's left. Murawski told defendant to put his arms behind his back. Defendant did not comply with the command and placed his arms underneath his stomach. Murawski could hear that other officers had arrived, and he yelled that he was in the backyard. Murawski tried to place defendant's left arm behind his back, but defendant resisted. Officer Woloszyk arrived 15 to 20 seconds later and tried to place defendant's right arm behind his back but was unable to. The whole time, defendant was yelling.

¶ 16     Sergeant Rich Clark arrived shortly thereafter and the three were able to handcuff defendant. They sat defendant up in the "recovery position." They then escorted defendant to a police car, and at this point defendant yelled something about St. Charles Police Chief Keegan and that he hoped the officers all died before they could get their pensions.

¶ 17     Defendant did not complain of any injuries, and Murawski did not observe any injuries to defendant. Murawski testified that he and the other officers did not choke, strike, kick, or threaten defendant.

¶ 18     The State next called Officer Steve Woloszyk of the St. Charles Police Department, who testified as follows. At approximately 8:55 p.m. on April 30, 2019, he responded to a call for backup at 1403 South Fourth Street in St. Charles. When he arrived, he approached the house and saw someone standing in the front doorway. Before he could announce himself, he heard Murawski call for help from the backyard.

¶ 19     Woloszyk hopped a fence to enter the backyard and saw Murawski in a struggle with defendant. They then fell to the ground. Woloszyk went to aid Murawski in apprehending defendant. Murawski had a hold of defendant's left arm, and Woloszyk grabbed it. Defendant was

flailing his arms and yelling, trying to break free. Defendant then put his right arm underneath himself, and Woloszyk ordered him to place his hands behind his back and to stop resisting. Sergeant Clark then arrived and helped handcuff defendant's left wrist, and then helped Woloszyk handcuff the right wrist.

¶ 20    The officers then put defendant in the "recovery position," made sure he was not injured, got him on his feet, and escorted him to the squad car. Woloszyk did not observe any injuries to defendant, and defendant did not indicate he was injured or ask for medical attention. As they placed him in the squad car, defendant was yelling as loud as he could and said he hoped the officers died before they received their pensions. Woloszyk testified that he did not punch, kick, strangle, or choke defendant.

¶ 21    Commander Rich Clark of the City of St. Charles Police Department testified as follows. On April 30, 2019, Clark was a sergeant with the St. Charles Police Department assigned to the evening shift. At approximately 8:55 p.m., he drove to 1403 South Fourth Street to provide Murawski with backup. He arrived approximately 10 seconds after Woloszyk. As Clark got out of his car, Woloszyk was approaching the front door of the home. Clark then heard Murawski yell that he was in the backyard. Woloszyk jumped the fence to the backyard first, with Clark following. Clark was delayed slightly when some of his equipment got caught on the fence, but he shortly freed himself and went to assist the other officers. He observed Murawski on top of defendant and Woloszyk to the defendant's right. When Clark reached them, Murawski had defendant's left arm behind his back, and Clark assisted in handcuffing his left wrist. He then assisted Woloszyk in freeing defendant's right arm from underneath himself and handcuffed the right wrist. Defendant's demeanor was extremely aggressive, and he was shouting profanities. The officers were all yelling at defendant to stop resisting.

¶ 22   After they had handcuffed defendant, they rolled him onto his side and then stood him upright. Clark did not observe any injuries to defendant. Defendant did not complain of any injuries, and yelled, "I hope you fucking die before you ever get your pension" and "fuck Chief Keegan."

¶ 23   After Woloszyk left with defendant, Clark spoke with Jamie and Leland and then went next door to check on defendant's mother, but no one answered the door. He then spoke with the Engels again who told him she would not answer the door without defendant there. Clark returned the next day and spoke with Jamie and Leland Engel. They refused to give a written statement regarding the incident as they had recently signed a two-year lease with defendant and did not want to have any issues.

¶ 24   The State rested, and defendant moved for a directed verdict, which the court denied.

¶ 25   Defendant called Dr. Patricia Burke, who testified as follows. On May 1, 2019, Dr. Burke examined defendant at the Kane County jail. Defendant had complained that he had tenderness in his neck, a lump on his neck, and a sore throat. He claimed he had been choked the day before. Dr. Burke observed a lump on defendant's neck and a couple of scratches on his hand, but she otherwise did not observe any injuries to defendant. He had normal range of motion in his neck, and was able to swallow water, though he complained that it hurt.

¶ 26   Defendant next called Jamie Engel, who testified as follows. Jamie, his father Leland, and his sister Justina had been renting 1403 South Fourth Street from defendant and his mother. On April 30, 2019, at around 8:30 p.m., defendant had come over to fix the washing machine. Defendant, Leland, and Jamie were in the basement troubleshooting the washing machine, when at around 9 p.m. there was a knock at the door. Jamie went upstairs and saw Justina speaking to a police officer. The officer asked if defendant was there, and she said yes. He did not recall the

officer ever mentioning that he was with the police or that he had a warrant. Jamie then went to the bathroom. When he left the bathroom, he went to the basement steps, saw the officer was in the basement, decided he did not want to be involved, and went back upstairs.

¶ 27     He then saw the officer come upstairs and walk out the front door. Shortly thereafter, an officer (Jamie was not sure if it was the same one) entered through the front door and headed in the direction of the kitchen and basement stairs, but Jamie did not see where the officer went. He then heard a commotion outside. He heard defendant yelling but could not recall hearing any particular words.

¶ 28     He decided that he did not want to be involved and went to his room to go to bed. He did not recall anyone coming to the door after the commotion. The next day, an officer came to the house and asked Leland and Jamie "to sign kind of a paper." Leland declined, and Jamie walked away from the conversation before it ended. Jamie admitted that his memory about what had happened was not very good.

¶ 29     Defendant then called Leland Engel who testified as follows. Leland remembered very little about the night of April 30, 2019. He was in the basement with defendant working on the washing machine when a police officer arrived at his home. Leland asked the officer if he had a warrant, and the officer told him that he had a warrant for defendant's arrest. Leland told the officer to get out of his house, and he followed the officer upstairs. The officer left out the backdoor, and Leland heard a commotion. He heard someone yell "I can't breathe," and "you're choking me." Leland stayed in the house and did not go to look at what was happening in the backyard. A police officer came back to the house later that night, but Leland did not remember how much time had passed or what the officer wanted.

¶ 30     Defendant then called Justina Engel, who testified as follows. On April 30, 2019, a police officer knocked on the front door and identified himself as an officer with the St. Charles police and gave his name, which she did not remember. He asked her if defendant was there and asked to speak with him. Before the officer arrived, she was in the basement with Leland, Jamie, and defendant. She told the officer that defendant was in the basement fixing the washer. The officer asked to enter, and she let him in. Justina and the officer were standing in the living room, when she heard someone yell from the basement, "tell him to get out of my house." The officer then went to the basement stairs and said in a loud voice that there was a warrant for defendant's arrest and that defendant needed to come with him.

¶ 31     Eventually, the officer exited through the backdoor and arrested defendant in the backyard. Justina did not go to look in the backyard, but she heard defendant say that he was being choked.

¶ 32     Danika McGee, a registered nurse who was employed at the Kane County jail, could not be located for testimony on the second day of trial. At a recess during Justina's testimony, the trial court made it clear that it would not continue the trial in order to locate McGee, even after defendant indicated that he wanted to have her testify. McGee had examined defendant at the Kane County jail following his arrest and had made notes pertaining to that examination. The trial court asked defendant if there was anything he intended to have McGee testify to that was not contained in the examination notes. He responded that he intended to have her testify regarding a railroad track shaped bruise on the back of his leg.

¶ 33     The State was willing to stipulate to the contents of McGee's notes from her examination of defendant. As McGee had not been located, the trial court gave defendant the option of accepting the State's stipulation or proceeding without any testimony. Defendant accepted the stipulation, which was read to the jury as follows:

"[McGee] is a registered nurse and [she was] employed by the Kane County Sheriff's Office at the Kane County Jail on or about April 30th through at least May 2nd, of 2019.

She would further testify that on May 2nd, 2019, at approximately 12:36 p.m. she met with the Defendant who complained of fresh cuts being on his hands. She noted dry skin and dirty nails but no broken skin. The Defendant also complained of a bump on his head that he found on May 2nd, 2019, when he was showering.

She would testify that she did palpate a bump on the right side of head, behind the ear. There was no redness or bruising that would suggest this is a new injury. However, Defendant states he has pain. He was offered Tylenol and denied wanting to take any medication."

¶ 34 Defendant then called Murawski, Woloszyk, and Clark. Their testimony did not differ meaningfully from their testimony in the State's case.

¶ 35 The last witness defendant intended to call was the Chief James Keegan of the St. Charles Police Department. Outside the presence of the jury, the State objected on the grounds that calling Chief Keegan would amount to a fishing expedition. The trial court asked defendant what he intended Chief Keegan to testify to, and he responded that he would testify to the department's use of force policy. The trial court determined that Commander Clark was still in the building, and was familiar with the department's policy. The trial court stated that it would not allow defendant to call Keegan but would allow him to call Clark to testify to the department's use of force policy. Defendant agreed to call Clark.

¶ 36    Clark was recalled and testified that according to the St. Charles Police Department's use of force policy, "[a]pplying force to the arrestee's throat sufficient to prevent him from breathing or obstructing a person's blood supply to [his head]" would "virtually always be unreasonable and should not be utilized[.]" Clark testified that this policy was applicable to all arrests including defendant's, and that no procedure was violated during defendant's arrest.

¶ 37    Defendant then testified on his own behalf. He testified that he had gone over to the Engels's house to work on the washing machine. While he was working, the Engels came in and out of the basement intermittently. At some point he was alone in the basement diagnosing the washer, when he became aware that there were people on the stairs.

> "And then I look up or something notices me, I feel like a herd of elephants, and that's the best thing I could describe. And I kind of stand up and look over. And I see what I thought was eight feet, it's probably only six. But all this commotion, feet shuffling and I had no idea what it was. And I looked over and I saw this person staring at me. And I thought I saw all the tenants but I probably only saw two of the tenants, that's what the six feet were, instead of the eight feet. But I saw familiar faces and I saw an unfamiliar face.

> ***

> And I'm wondering, who in the heck is over in my basement, in the bowels of my house while I'm working my fanny off, thinking he owns this place? I didn't think any quicker. In a split second I told him to get the F out of this house. I'm the owner, you don't come into my house. And he looked at me and he said, okay. He turned right, to his right and walked up the stairs. It took five seconds. And Leland and I believe it was Justina, I'm not sure, I didn't look at them when they were

walking backwards, all these feet went back upstairs. They all had dark pants, clothes, whatever you want to call it, black. The tenants for some reason wear a lot of dark clothes, black. I was in blue jeans with a long sleeve shirt.

And I couldn't believe it. I didn't have to use force on this person. The only thing I thought was, this looks like a skinhead. And by that I mean, it was a he, for that I could discern, he had like a crew cut. It was kind of blond but I don't really know. And it just reminded me of a skinhead."

¶ 38 Leland returned to the basement around two minutes later, and defendant asked him if the man had gone. Leland replied that he had not, and defendant quickly ran up the stairs.

"When I was walking up the steps, my mind was racing a mile a minute. I thought, who is over here? And then I thought, things are going so much faster through my mind and I'm actually talking and I'm talking pretty fast. Who is this guy? Who is this skinhead? Who is this person? I don't know, in my house at 9:00 o'clock, in the bowels of my basement. All I know is he doesn't belong here.

So on the way up I thought, well I know that Jamie played pool and that was when we were interviewing, he had to go over and play pool wherever they play pool. I thought maybe it's some loan shark or something. And I thought oh, that's stupid. And then I thought, well maybe it's the first of the month is tomorrow, maybe it's someone thinking they have money and they're gonna rob them. So at first I was worried about trying to defend the property. Then I worried about trying to defend the tenants.

Then on my way up the stairs, I heard the chattering, is the best description I could say, of noise in the kitchen and it sounded like little elephants. And I

thought, something is wrong here. I feel bad for the tenants but I have to look out for my own self first. I don't know what's going on, I have got to get away from here. None of this made any sense and it happened very quick. So the backdoor is right there."

¶ 39 Defendant then recounted how he went into the backyard and hid behind the tool shed. He described someone exiting the house after him as:

"About three or four seconds later, it sounded like somebody was taking the door off the backdoor, in other words, the storm door. I didn't know what it was. I didn't know who it was. I had an idea or a guess that it was this person, skinhead or whatever you want to call it. He then proceeded out. And as I said, I don't even know if it was a he, I'm just assuming. I had about five seconds exposure in the basement. He proceeded out to the center of the yard."

¶ 40 Defendant went on to describe how the man searched the yard with a flashlight and eventually located him behind the shed.

"I don't know what to do now. I'm not gonna attack him. I don't do that. I can't defend my property, I have nothing to defend myself with. I'm fleeing.

As soon as he lit me up, he came at me like a mad dog. I assume, I think it was the same person, I don't know, it could have been somebody different, that would be the second time.

I immediately took one step out from the shed. *** I take one step out and two steps this way, two or three steps—one, two or three steps. It took a total of one and a half, maybe two seconds, a distance of six feet, maybe eight, and I was hit like a football player being tackled. I was either tackled or tripped, I don't know,

it happened so fast. And it would have been *** approximately two or three feet off of the sidewalk if you extended it on the grass. That is my best recollection.

He had shined the light in my eye, and it was so dark, I basically was night blinded. I don't recall doing this, but instinct would tell me that I would try and shield my hand or eye or something. I'm blind. I know where the gate is, I know how many steps it is, I know the way I want to go to get free. I know the way I want to go and get away from this person who's attacking me or who may attack me or who I perceive is, I don't know, I just couldn't think. Needless to say, I got stopped here.

Quicker than I could think—quicker than I could think, I—I couldn't see, I couldn't see anything. I couldn't see black. I couldn't see the edges of my eyelids. I couldn't see the edges of anything.

And then I couldn't hear. The only reason I know that is I have tinnitus, I've had it for 40 years. And I couldn't hear it, and I could tell when it was there and when it wasn't and I couldn't tell it was there. And I thought this must be what it's like to be dead. I'm sorry.

Some time passed but I don't have a clue, it could have been a day, it could have been a week, it could have been a year, it could have been a few seconds.

I remember my vision like looking through a waterfall of dark red water or a piece of acetate, dark red. And then I could hear something, although I don't know what it was.

And then I said, you're choking me, I can't breathe, I can't breathe, I can't breathe, three times for each one of the tenants. And I just prayed that somebody heard me. And I guess the fact that I could hear myself indicated that I wasn't dead.

And then I remember tensing my body and summoning all the strength I could to break this choke hold. And I understand when people say, you have the strength of—because I used every ounce of energy I had all at once and I would believe that I was able to break this choke hold. It's something I never want to experience again. couldn't see."

¶ 41 Defendant went on to testify that he did not hear anyone say anything while he was on the ground. He was then handcuffed and stood up. He was walked to the end of the driveway by a man who "looked like a wolfman jack," and there he saw three police cars.

¶ 42 Defendant then made a remark about how he had spent 95 days in jail following his arrest, which prompted the judge to hold a sidebar outside the presence of the jury. After admonishing defendant not to discuss that he had spent time in jail, and while still outside the presence of the jury, the court held the jury instruction conference. Defendant requested that the jury be instructed on self-defense, and the State objected. The trial court determined that a self-defense instruction was inappropriate and would not be given.

"The testimony I have before me and the statement I have before me from Mr. Ericson is that he fled; he did not fight. There is no evidence I have in front of me that Mr. Ericson admits that he actually landed a punch. He says that he was running away, that he was tackled and he did absolutely nothing. The only thing that he did do was tense his body.

I can't say even slight evidence of self-defense has been given in this case. Because there is no evidence before me, nor am I going to allow you now to take the stand and do it; but there's no evidence before me that he ever, from Mr. Ericson—there's evidence that he punched the officer. But there's no evidence that he was defending himself when he punched the officer.

Mr. Ericson, in fact, testified he doesn't even know if he punched anybody. He did argue that he doesn't know it's an officer, which I suppose is a different element. But in this case he had not admitted to the actual offense. And to make an affirmative defense, you have to admit to it, which he's not done, even in slight evidence.

And for that reason, I'm going to deny the self-defense instruction at this time."

¶ 43 Defendant then retook the stand and testified as follows:

"When Mr. Murawski lit me up with the flashlight, I was blinded. I knew that I had been identified or caught, whatever you want to say. I instinctively stepped out from the shed, turned 90 degrees to the left to try and get away from him through the only exit available, which was the gate.

I had no intention of hurting him. I had no intention of harming him. If I did, it was completely inadvertent.

\* \* \*

If I inadvertently hit him, I did not mean to hit him. I don't mean harm to anybody.

\* \* \*

I was unaware that this person was a peace officer. Only later on did I find out.

I have nothing more."

Following cross-examination, defendant rested. He did not renew his motion for a directed verdict.

¶ 44    While the jury was deliberating, the court received the following question from the jury: "Your Honor, on the first proposition of aggravated battery, does knowingly need to mean premeditated or can it be reactionary?" In response, the court instructed the jury with the definition of "knowingly" provided by Illinois Pattern Jury Instructions, Criminal, No. 5.01B (approved October 28, 2016).

¶ 45    The jury ultimately returned a verdict of guilty on both the counts of aggravated battery and resisting arrest.

¶ 46    On August 31, 2020, defendant filed a motion for a new trial, which was denied.

¶ 47    On September 18, 2020, defendant was sentenced to four years' imprisonment.

¶ 48    Defendant timely appealed.

¶ 49                                    II. ANALYSIS

¶ 50    Defendant raises several issues on appeal. Defendant argues that (1) the court's COVID-19 safety procedures violated his right to a public trial; (2) his statutory speedy-trial rights under section 103-5(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-5(b) (West 2018)) were violated, despite our supreme court's administrative order tolling speedy trial calculations; (3) the trial court erred when it failed to instruct the jury on self-defense; (4) the trial court erred in denying defendant's motion for a directed verdict; (5) the trial court erred in refusing to continue

trial in order to locate McGee and in preventing defendant from calling Keegan as a witness, and (6) that the trial court failed to properly answer the jury's question regarding the term "knowingly."

¶ 51                                            A. Public Trial

¶ 52    Defendant argues that the closure of the courtroom violated his sixth amendment right to a public trial.

¶ 53    A criminal defendant is guaranteed a right to a "speedy and public trial." U.S. Const., amend. VI. "Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Presley v. Georgia*, 558 U.S. 209, 215 (2010).

> " '[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.' " *Id.* at 214 (quoting *Waller v. Georgia*, 467 U.S. 39, 48 (1984)).

"In general, the standard of review for determining if an individual's constitutional rights have been violated is *de novo*." *People v. Hale*, 2013 IL 113140, ¶ 15.

¶ 54    Defendant's trial was among the first conducted in Kane County following the suspension of trials during the beginning of the COVID-19 pandemic. To guard against the spread of COVID-19, the trial court enacted various safety measures, which included excluding members of the public from the courtroom and seating the jurors in the benches generally used by members of the public, where they could socially distance. As the public was excluded from the courtroom, the trial was broadcast to another courtroom, which was open to the public.

¶ 55    Defendant argues that when he arrived at the courtroom the day of the trial, he observed that there would be nowhere for members of the public to view the trial and called his sister to tell

her not to come to the trial. Defendant maintains that no members of the public, press, or his relatives were permitted in the courtroom, and therefore he did not receive a public trial. He further maintains that he did not waive his right to a public trial. The State responds that defendant was informed of the safety protocols prior to trial and made no objection, thus forfeiting the issue.

¶ 56     The failure to object to an error at trial and include the error in a posttrial motion constitutes forfeiture or procedural default of the issue. *People v. Johnson*, 238 Ill. 2d 478, 484 (2010). "A contemporaneous objection is particularly crucial when challenging any courtroom closure." *People v. Radford*, 2020 IL 123975, ¶ 37. If there is no objection at trial, there is no opportunity for the judge to craft an alternative solution or to explain in greater detail the justification for the closure. *Id.* Here, defendant failed to make a contemporaneous objection at trial and therefore forfeiture applies.

¶ 57     However, under the plain error doctrine, a reviewing court may consider a forfeited claim when "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 58     Here, the trial court did not err in excluding members of the public from the main courtroom and broadcasting the trial to another courtroom open to the public. Illinois courts and many others have found that protecting public safety during the COVID-19 pandemic constituted an overriding interest and that the procedure of closing the courtroom to spectators while allowing the public to watch the trial remotely is a reasonable accommodation. See, *e.g.*, *People v. Paul*, 2022 IL App (5th) 210297-U, ¶¶ 18-19 (collecting cases); *United States v. Richards*, 2020 WL

5219537 (M.D. Ala.), slip order at 2-4; *United States v. Huling*, 542 F. Supp. 3d 144, 145-48 (D.R.I. 2021); *cf. United States v. Allen*, 34 F.4th 789, 798 & n.5 (9th Cir. 2022) (order closing courtroom and allowing public only audio access was too restrictive given that "courts throughout the country" had successfully allowed video streaming of proceedings; collecting cases). Accordingly, defendant's right to a public trial was not violated, and as there was no error, there can be no plain error. See *People v. Walker*, 232 Ill. 2d 113, 124 (2009).

¶ 59                                    B. Speedy Trial

¶ 60    Defendant argues that the trial court erred in denying his motion to dismiss based on the violation of his statutory speedy-trial rights pursuant to section 103-5(b) of the Code of Criminal Procedure of 1963, which requires that defendants "on pretrial release or recognizance shall be tried by the court having jurisdiction within 160 days from the date defendant demands trial unless delay is occasioned by the defendant[.]" 725 ILCS 5/103-5(b) (West 2018). Defendant's trial was continued pursuant to a general order of the Kane County circuit court (16th Judicial Cir. Ct. G.O. 20-09 (March 25, 2020, amended April 22, 2020)) which was promulgated under the authority granted to the circuit courts by the supreme court's March 20, 2020, administrative order, allowing the chief judges of the circuit courts to continue trials for 60 days. Ill. S. Ct., M.R. 30370 (eff. March 20, 2020). The supreme court's order also included a provision stating that, "any delay resulting from this emergency continuance order shall not be attributable to either the State or the defendant for the purposes of section 103-5 of the Code of Criminal Procedure of 1963 [citation]." Ill. S. Ct., M.R. 30370 (eff. March 17, 2020).

¶ 61    Defendant accepts the trial court's calculation that 150 days had passed on his speedy-trial demand as of the supreme court's March 20, 2020, order. Even were we to include the additional

five days between the supreme court's administrative order and the entry of the circuit court's general order continuing defendant's trial, only 155 days would have passed on his demand.

¶ 62    Defendant argues that although Kane County's general order stated that the continuances were "in the best interest of the public, including parties, witnesses, and all court personnel" (16th Judicial Cir. Ct. G.O. 20-09 (March 25, 2020)), continuing his trial was not in his best interest. He further argues that local rules may not abrogate, limit, or modify existing law, as only the legislature has authority to modify statutes, not the courts, and that the supreme court and circuit court's orders were without authority.

¶ 63    Our supreme court has already considered the issue of whether it had authority to continue trials in contravention of section 103-5 of the Code of Criminal Procedure and held that because the conflict between the supreme court's order and section 103-5 "arises in the context of court procedure, the court rule prevails." *People v. Mayfield*, 2023 IL 128092, ¶ 41, *reh'g denied*.

¶ 64    Accordingly, the trial court did not err in denying defendant's motion to dismiss based on a violation of his statutory speedy trial right, where the circuit court's general order, under the authority of the supreme court's order, tolled speedy trial computations due to the COVID-19 pandemic.

¶ 65                              C. Self-Defense

¶ 66    Defendant argues that the trial court erred when it refused to instruct the jury on his theory of self-defense. "The question of whether sufficient evidence exists in the record to support the giving of a jury instruction is a question of law subject to *de novo* review." *People v. Washington*, 2012 IL 110283, ¶ 19. It is well settled that a defendant is entitled to a jury instruction on an affirmative defense if there is some evidence in the record, however slight, to support the defense. *Id.* at ¶ 43.

"The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *People v. Lee*, 213 Ill. 2d 218, 225 (2004).

¶ 67    In the instant case, defendant was charged with resisting arrest and aggravated battery of a peace officer. A person is not authorized to use force to resist arrest even if the arrest is unlawful. 720 ILCS 5/7-7 (West 2018). To claim self-defense when a defendant is charged with resisting arrest or aggravated battery of a peace officer during an arrest, a defendant must show that they were either unaware of the police officer's identity or that the officer used excessive force. *People v. Ammons*, 2021 IL App (3d) 150743, ¶ 21.

¶ 68    Regarding the aggravated battery charge, defendant's testimony was that he was temporarily blinded and deafened. He testified that he did not recall doing so, but it would make sense instinctually to shield his eyes from the flashlight. He testified that he had no intention of harming or hurting Murawski, and that if he did it was completely inadvert. This does not describe self-defense, but rather a reflexive or inadvertent contact, and thus no self-defense instruction was warranted on the aggravated battery charge.

¶ 69    Regarding the resisting arrest charge, it was defendant's testimony that after he fled from Murawski he was tackled or tripped and placed in a chokehold. He said, "I can't breathe" three times, and then summoned all of his strength and tensed his body to break the chokehold.

¶ 70    While a self-defense instruction can be given in a resisting arrest case when the arresting officer uses excessive force, "[a] self-defense instruction should only be given in a resisting arrest

case when a defendant resists arrest *after* the officers resort to using excessive force. A self-defense instruction is inappropriate *** where defendant resisted arrest and then officers used force to effectuate the arrest." [Emphasis added.] *People v. Haynes*, 408 Ill. App. 3d 684, 691 (2011). In the instant case, defendant had fled the house, hidden from Murawski, was discovered by Murawski, struck Murawski, and attempted to flee again, before the alleged excessive force occurred.

¶ 71    Further, defendant's claim that he did not know Murawski to be a police officer does not alter our conclusion. Murawski, Leland, and Justina all testified the Murawski identified himself as a police officer, was dressed in uniform, and informed defendant that he was there to place defendant under arrest. " '[A] defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.' " *People v. Everette*, 141 Ill. 2d 147, 156 (1990) (quoting *Mathews v. United States*, 485 U.S. 58, 64 (1988)).

¶ 72    However, in light of the other witnesses' testimony, no reasonable jury could have believed defendant's bizarre and picturesque testimony that he believed Murawski to be a skinhead or loan shark from the pool hall. Because defendant had fled from and struck Murawski prior to the alleged chokehold, he was not entitled to a self-defense instruction regarding the resisting arrest charge.

¶ 73                D. Motion for Directed Verdict/Sufficiency of the Evidence

¶ 74    Defendant argues that the trial court erred in denying his motion for a directed verdict as the State failed to prove him guilty beyond a reasonable doubt on both charges. Defendant seems to be conflating the standard for a directed verdict with the standard for whether there was sufficient evidence to sustain a conviction. Regardless, there was sufficient evidence to both sustain his convictions and to overcome defendant's motion for a directed verdict.

¶ 75    Section 115-4(k) of the Code of Criminal Procedure of 1963 provides:

"When, at the close of the State's evidence or at the close of all of the evidence, the evidence is insufficient to support a finding or verdict of guilty the court may and on motion of the defendant shall make a finding or direct the jury to return a verdict of not guilty, enter a judgment of acquittal and discharge the defendant." 725 ILCS 5/115-4 (k) (West 2020).

A motion for a directed verdict "requires the trial court to consider only whether a reasonable mind could fairly conclude the guilt of the accused beyond reasonable doubt, considering the evidence most strongly in the People's favor." *People v. Withers*, 87 Ill. 2d 224, 230 (1981). For the purposes of a directed verdict, the defendant admits the truth of the facts in the State's evidence. *People v. Kelley*, 338 Ill. App. 3d 273, 277, 788 (2003). Whether the trial court erred in denying a motion for a directed verdict presents a question of law we review *de novo*. *Id.*

¶ 76 Additionally, "it is well settled that a defendant who chooses to present evidence after the denial of his motion for a directed verdict at the close of the State's case [forfeits] any error in the trial court's ruling on the motion unless he renews the motion at the close of all the evidence." *Kelley*, 338 Ill. App. 3d at 277. As respondent failed to renew his motion for directed verdict at the close of all evidence, he has forfeited his claim regarding his motion for directed verdict.

¶ 77 Whereas a challenge to the sufficiency of the State's evidence requires a reviewing court to determine, "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotations omitted.) *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

¶ 78 To convict defendant for aggravated battery, the State needed to show that defendant knowingly and without legal justification caused bodily harm to Murawski and that he knew

Murawski to be a peace officer engaged in the execution of his official duties. 720 ILCS 5/12-3.05(d)(4)(i) (West 2018).

¶ 79    A person resists arrest when they knowingly perform some physical act which imposes an obstacle which may impede, hinder, interrupt, prevent, or delay the arrest, such as going limp or forcefully resisting. 720 ILCS 5/31-1 (West 2018); *People v. Raby*, 40 Ill. 2d 392, 399-400 (1968).

¶ 80    "It is well established that a single, positive identification by someone who had ample opportunity to observe the offender is sufficient to support a conviction." *People v. Conway*, 2023 IL 127670, ¶ 18, *reh'g denied*. This is so even when such testimony is contradicted by the defendant. *People v. Morehead*, 45 Ill. 2d 326, 330 (1970).

¶ 81    In the instant case, Murawski testified positively that he identified himself as a police officer to defendant, and told him that there was a warrant for his arrest. He likewise testified that defendant struck him after he located defendant in the backyard, and that defendant tensed up and refused to allow Murawski and the other officers to place him in handcuffs. The testimony of Woloszyk and Clark further corroborated Murawski's testimony regarding the resisting arrest charge, though not the aggravated battery, as neither were present. Accordingly, even if defendant had not forfeited the issue, there was sufficient evidence to support the denial of defendant's motion for a directed verdict, and to support his convictions.

¶ 82                              E. Defendant's Witnesses

¶ 83    Defendant argues that the trial court denied him his sixth amendment right to a fair trial and his fourteenth amendment due process rights when it refused to allow him to call McGee and Keegan as witnesses.

¶ 84    Although defendant never formally requested a continuance to obtain McGee's presence, the trial court stated preemptively that it would not allow such a continuance. In reviewing the

denial of a continuance to secure the presence of a defense witness, we consider, "(1) whether defendant was diligent; (2) whether defendant has shown that the testimony was material and might have affected the jury's verdict; and (3) whether defendant was prejudiced." *People v. Ward*, 154 Ill. 2d 272, 307 (1992). We review the trial court's ruling for an abuse of discretion. *Id.* "Refusal to grant a continuance may constitute an abuse of discretion when it interferes with the ascertainment of the truth as to whether the person accused is, in fact, guilty of the crime charged." *People v. Gardner*, 282 Ill. App. 3d 209, 215 (1996).

¶ 85    The record indicates that defendant was diligent in trying to obtain McGee's presence at trial. He stated that he had made several attempts to call her and had secured her presence in court the previous day. Regarding whether McGee's testimony was material, the only thing which defendant claimed McGee would testify to that was not contained in her notes was the presence of a railroad track shaped bruise on the back of his leg. The primary purpose of McGee's testimony was to corroborate defendant's claim that he was placed in a chokehold by the arresting officers. The presence of a bruise on his leg does little to establish that he was placed in a chokehold. Further, defendant himself was able to testify regarding the bruise. In light of the notes which were read into the record, McGee's testimony would not have been material, and he was not prejudiced by the lack of her testimony. Accordingly, the trial court did not err in refusing to continue the trial.

¶ 86    As for Keegan, he was not present at defendant's arrest and was only being called to testify to the department's use of force policy. Defendant maintains that recalling Clark to testify regarding the use of force policy "implicitly gave more weight to the State's case" and that he "was not allowed to question the veracity of three peace officers' testimony with an independent or disinterested party." We do not see how recalling Clark to testify regarding the department's

use of force policy gave more weight to the State's case. As for challenging the veracity of the officer's testimony, Keegan was not a witness to the arrest and could not testify to the veracity of the officers' testimony regarding the arrest. Additionally, it is not clear how the chief of the police department could be considered an independent or disinterested party when it comes to the conduct of the officers under his command.

¶ 87    Regardless, defendant was not prejudiced by having Clark testify rather than Keegan. Clark testified that the use of force policy forbade chokeholds in essentially every arrest and that the policy applied to defendant's arrest, which was all Keegan would have been able to testify to. Accordingly, the trial court did not abuse its discretion in refusing to continue to the trial to obtain McGee's presence, or in not allowing defendant to call Keegan as a witness.

¶ 88                           F. Response to the Jury's Question

¶ 89    Defendant argues that the trial court erred when it refused to answer the jury's question, "[d]oes knowingly need to mean premeditated or can it be reactionary?" and instead sent back the definition of "knowingly" given in Illinois Pattern Jury Instructions, Criminal, No. 5.01B (approved October 28, 2016). We note that defendant made no objection to the court's response to the jury's question and thus forfeited the issue. *People v. Lewis*, 234 Ill. 2d 32, 40 (2009) ("Both a contemporaneous objection and a written posttrial motion are required to preserve an issue for review.").

¶ 90    However, even were the issue not forfeited, the trial court did not abuse its discretion in answering the jury's question by providing them with the pattern instruction. See *People v. Reid*, 136 Ill. 2d 27, 39 (1990) (whether and how to answer a jury's question is within the discretion of the trial court). Illinois Pattern Jury Instructions, Criminal, No. 5.01B was enacted to address jury confusion over the term "knowingly," and following its addition in 1989, "a general rule has

emerged: if a jury asks the court to define a mental state term, or manifests confusion or doubt regarding such a term's meaning, the court must instruct them accordingly." *People v. Sperry*, 2020 IL App (2d) 180296, ¶¶ 15, 17. As such, the trial court acted appropriately by providing the instruction when the jury expressed confusion, and there was no error.

¶ 91                                    III. CONCLUSION

¶ 92    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 93    Affirmed.