2025 IL App (3d) 150880-C

Opinion filed May 7, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-15-0880 Circuit No. 12-CF-1799 |
| JAMES A. PACHECO, | ) ) ) | Honorable Carla Alessio-Policandriotes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HETTEL[*] delivered the judgment of the court, with opinion.
Presiding Justice Brennan and Justice Peterson concurred in the judgment and opinion.

_____

**OPINION**

¶ 1        Defendant, James A. Pacheco, appeals from his convictions for aggravated assault,

criminal damage to property, aggravated fleeing or attempting to elude a peace officer, and

driving while under the influence of alcohol (DUI). Defendant argues (1) the Will County circuit

court erred in replaying video and audio recordings in the courtroom in the presence of the

parties and trial judge, (2) the court violated defendant's right to confrontation by limiting his

cross-examination of a police officer, (3) the court abused its discretion in granting the State's

_____

[*]Justice Hettel was administratively reassigned to this case on January 6, 2025, due to the
retirement of Justice McDade.

motion *in limine* to bar defense counsel from questioning two police officers about their failure to write police reports, (4) the State committed prosecutorial error during closing argument, and (5) defendant is entitled to monetary credit for time spent in presentence custody.

¶ 2        We initially reversed defendant's convictions, finding that the court erred by (1) permitting the jury's review of the video and audio recordings in the courtroom and in the presence of the parties during deliberations, (2) violating defendant's right to confrontation by limiting the scope of defense counsel's cross-examination of police officer Adam Stapleton, and (3) granting the State's motion *in limine*. *People v. Pacheco*, 2019 IL App (3d) 150880, ¶¶ 39, 64, 79. Subsequently, our supreme court vacated the judgment and directed this court to reconsider our decision in light of *People v. Hollahan*, 2020 IL 125091. *People v. Pacheco*, No. 125191 (Ill. Nov. 18, 2020) (supervisory order). Again, we reversed and remanded, finding that the circuit court violated defendant's right to confront witnesses when it (1) barred cross-examination of a police officer related to the effect this case had on his employment and (2) granted the State's motion *in limine* barring questioning the officers regarding their failure to write police reports. *People v. Pacheco*, 2021 IL App (3d) 150880-B, ¶¶ 49, 63, 78. Our supreme court reversed, finding that the circuit court did not err in limiting Stapleton's cross-examination or granting the State's motion *in limine* and remanded the cause to this court for further proceedings. *People v. Pacheco*, 2023 IL 127535, ¶¶ 50, 52, 61. We affirm and remand for the circuit court to correct the sentencing judgment to reflect the appropriate presentence monetary credit.

¶ 3                                    I. BACKGROUND

¶ 4        Prior to trial, defendant pled guilty to criminal damage to property (720 ILCS 5/21-1(a)(1) (West 2012)) and proceeded to a jury trial on aggravated assault (*id.* § 12-2(b)(4)(i),

2

(c)(8)), attempted aggravated battery (*id.* §§ 8-4, 12-3.05(d)(4)(i)), aggravated fleeing or attempting to elude a peace officer (625 ILCS 5/11-204.1(a)(4) (West 2012)), and DUI (*id.* § 11-501(a)(1)). At trial, Officer Stapleton and Officer Eric Zettergren testified that they were working in the early morning hours on July 30, 2012, when they received a report of criminal damage to property committed by an individual driving a black Nissan. While Stapleton drove to the scene of the complaint, they encountered defendant driving a black Nissan. Stapleton activated his overhead lights, and defendant stopped his vehicle. When the officers exited their squad car, defendant drove away. The officers began pursuing defendant. Stapleton activated his siren and used the squad car's public address system numerous times to tell defendant to stop his vehicle. Defendant continued driving at a high rate of speed and committed several traffic violations while the officers continued to follow.

¶ 5        Eventually, a stopped train blocked defendant's path, causing him to stop the vehicle. Stapleton positioned the squad car so that it was parallel with defendant's vehicle. Stapleton exited the squad car and moved to the back corner of the driver's side of the squad car. Zettergren also exited the squad car, and Stapleton lost sight of him. Defendant reversed his vehicle, and Stapleton repeatedly told defendant to stop. Defendant's vehicle stopped and then started to roll forward as if defendant had taken his foot off the brake. Defendant's vehicle then turned toward Stapleton and began to accelerate. Stapleton backed up and repeatedly ordered defendant to stop the vehicle. Defendant's vehicle continued to accelerate toward Stapleton. Stapleton did not believe he had time to move out of the way and was afraid that he was going to be killed. Stapleton discharged his firearm seven times in the direction of defendant. Stapleton knew he was standing in front of defendant's vehicle the entire time he discharged his firearm, but he did not remember if he was positioned in the center or to the left of the vehicle. After

3

Stapleton discharged his firearm, he was able to move out of the way of defendant's vehicle. Defendant then fled the scene at a much higher rate of speed than when he accelerated toward Stapleton. Stapleton and Zettergren reentered the squad car and continued pursuing defendant.

¶ 6　　　　The State introduced into evidence audio and video recordings of the encounter captured by surveillance equipment. In the audio recording, a voice could be heard yelling, "I didn't do anything." Another voice repeated "stop the car" several times, followed by seven gunshots. The gunshots began approximately one second after the voice said "stop the car" for the last time. After that, a vehicle could be heard accelerating. Then, sirens and the sound of another vehicle accelerating could be heard. The video recording showed a grainy image of a parked semitruck.[1] A dark-colored vehicle drove past the semitruck. A squad car with its sirens and lights activated followed closely behind the dark-colored vehicle. The two vehicles drove off the screen, and voices could be heard. Seven gunshots could then be heard in rapid succession and the dark-colored vehicle drove back onto the screen. Stapleton could be seen running in front of the dark-colored vehicle. Stapleton was close to the dark-colored vehicle when he first appeared on the screen. Stapleton ran away from the vehicle. The gunshots began when the vehicle was off the screen and continued as the vehicle drove into the view of the camera. The vehicle drove away. Approximately 15 to 20 seconds later, the squad car followed.

¶ 7　　　　During cross-examination, defense counsel asked Stapleton: "Now, what caused you to fire is *** there was a sudden turn in the vehicle towards you and it accelerated at a high rate of speed. It was at that point in time you feared for your safety and fired your firearm, is that correct?" Stapleton replied, "I didn't say a high rate of speed. I said the vehicle had accelerated

---

[1]When reviewing the evidence in this case, the court discovered that the surveillance video recording had been damaged and compromised, therefore was unviewable. Notably, this matter has been on appeal several times with both appellate and supreme court orders. *Supra* ¶ 2. On this matter, we defer to the prior summaries describing what the surveillance video shows for purposes of this appeal.

4

towards me." Stapleton indicated that he was aiming for defendant when he discharged his firearm at the vehicle. Stapleton was "firing the rounds to stop the threat that was coming at me." Stapleton led the vehicle pursuit of defendant, who eventually struck a traffic signal pole and stopped. In reference to the video, defense counsel asked Stapleton whether "somebody refers to [defendant] as a piece of s***." Initially, Stapleton responded "[n]o" but clarified that Zettergren could be heard saying "stupid s***."

¶ 8       Zettergren testified consistently with Stapleton regarding much of the encounter but separately indicated that after exiting the squad car, he went to the front passenger side. Zettergren observed defendant continue to reverse the vehicle while he and Stapleton yelled at defendant to stop. Defendant then stopped his vehicle as it was directly facing Zettergren. The vehicle rolled forward and increased in speed. Zettergren did not know whether defendant had only removed his foot from the brake or whether defendant's foot was on the gas pedal. Defendant turned the vehicle to the left toward the rear of the squad car, away from Zettergren. Zettergren vaguely knew Stapleton's location at that time. Zettergren saw and heard defendant's vehicle accelerate. Zettergren heard Stapleton give more commands to stop the vehicle then shots being fired. He could not see Stapleton but observed defendant's vehicle flee the area.

¶ 9       Michael McAbee, a semitruck driver, testified that he and his son, Jamie Kirk, were sleeping in McAbee's semitruck in the early morning hours on the date of the incident. At approximately 2:45 a.m., McAbee heard sirens, which woke him up. He saw a black vehicle drive up to the train tracks where a train was parked. The black vehicle could not get around the train, and it turned around slowly, "like an old person." When the black vehicle turned around a squad car pulled up at an angle to it. Two police officers exited the squad car and yelled at the driver of the black vehicle to stop. The black vehicle was facing the squad car at a 30-degree

5

angle. One officer walked to the front of the squad car, and the other officer to the back. The black vehicle reversed and then started driving in the direction from which it had come. The officers were still yelling at the driver of the black vehicle. One officer drew his gun and yelled at the driver to stop the vehicle. McAbee could see the officer "a little bit" at that point. The black vehicle did not stop. Rather, "he acted as an old person; drove easy." McAbee heard gunshots and covered his face. When he looked up after a few minutes, both vehicles were gone.

¶ 10        Kirk testified that once awoken by McAbee, he saw a black vehicle facing away from the train toward the squad car. Kirk saw one police officer standing by the squad car on the driver's side near the trunk. The officer pointed his gun at the black vehicle and told the driver to stop the vehicle. The black vehicle did not move until after the officer fired his gun. Kirk stated that it was possible that the black vehicle was moving so slowly that he could not tell if it was moving. The black vehicle then drove away slowly.

¶ 11        Officer Chris Delaney, a crime scene technician, photographed defendant's vehicle after the incident. The photographs showed that there were two bullet holes on the passenger side of the windshield, three in the center, one on the driver's side, and one on the hood of the vehicle. Delaney had placed wooden rods through several of the bullet holes. The rods appeared to show the same bullet holes with contradicting points of entry. Delaney explained that the photographs looked different because they were taken from different vantage points. Delaney stated that the rods represented "a guess as to where the bullet may have entered and its possible path." Delaney was not a shooting reconstructionist. The State rested.

¶ 12        Officer Christopher D'Arcy testified that he assisted in the pursuit of defendant's vehicle following defendant fleeing from officers at the train tracks until the vehicle crashed into a traffic signal pole. When D'Arcy arrived, he exited his squad car and observed other officers

6

commanding defendant to exit the vehicle, but defendant did not comply. D'Arcy saw Stapleton deploy his taser. D'Arcy stated that defendant's failure to comply with the officers' verbal commands was the only behavior that required the use of the taser. After Stapleton deployed his taser, defendant exited the vehicle.

¶ 13    During closing argument, defense counsel argued that the evidence did not establish that defendant made a blatant attempt to hit Stapleton with his vehicle after an audible and visual acceleration of defendant's vehicle. Defense counsel asserted that although Stapleton testified that he was in front of defendant's vehicle when he discharged his firearm, the photographs of defendant's vehicle showed that the bullets entered from the side. Defense counsel pointed out several instances where he believed Stapleton's testimony was contradicted by the testimony of other witnesses. Defense counsel argued that the jury should:

> "ask yourself was this investigation from start to finish conducted in a manner that you as a citizen in this country feel is fair and unbiassed [*sic*] to both officers and to [defendant]. You have to consider that. That also can raise issues of reasonable doubt, if you just look at the thing and say, oh, man, I just don't like this. I just don't like the way this thing went down. As an American, as a citizen, I just don't like it the way this went down period."

Defense counsel continued:

> "Ladies and gentlemen, I think the whole case boils down to credibility, credibility and an understanding of human nature. If you believe that Officer Stapleton was out of control that day, do not believe him. If you believe the officers are not consistent with each other, do not find [defendant] guilty. If you think Officer Stapleton was purposely abuseful, don't believe a word out of his

7

mouth. If you think he was exaggerating here in Court, be offended, and then don't believe him. If you think he was acting to protect his own interests, don't believe him. If you think he lied when he said all the shots came from the front, don't believe him.

And, ladies and gentlemen, if you don't believe him, if you don't believe the officers, some of the officers in this case, there is not proof beyond a reasonable doubt."

¶ 14 In rebuttal, the prosecutor started by saying that "[defense counsel] has a fantasy. In fact, a lot of them[,] some of which he has shared with you today. He's got a fantasy about what the law is, about what [the] evidence [is]." Defense counsel objected, and the court instructed the jury that "final arguments are arguments from the attorneys what they believe the evidence has shown. The Court will be instructing you as to the law" and "[a]ny inconsistencies that may or may not have been suggested to you, you must disregard." The State asserted that:

"when you look at the evidence in this case[,] all of the evidence, every single piece of it just screams the Defendant's guilt. The Defendant's guilt is dripping off of every single piece of evidence in this case. There is not one piece of evidence in this case that exonerates the Defendant. There is not one piece of evidence in this case that excuses anything that [defendant] did this night. Every single piece of evidence in this case points directly to him.

Let's talk about the evidence. *** And let's talk about *** Stapleton, the person the defense has put on trial in this case."

The prosecutor continued that Stapleton was "working" when he received the call reporting criminal activity. He asserted:

8

"[Stapleton] didn't have to go.

*** He didn't make any excuses that night. He didn't back away or shy away from anything. He did his job. *** [Stapleton] could have easily put the blinders on and said, *** I don't feel like dealing with this, I'll take that report later on ***. But he didn't do that. He did his job. ***

***

*** [Defendant] did everything in his power to put himself, put the police and put the public in jeopardy that night.

And there are a few guys in existence who put themselves in harm's way who experienced facing danger that night in order to stop [defendant] from hurting somebody. *** That is what *** Stapleton is doing that night is protecting everyone in his community from the Defendant in this case.

* * *

*** Stapleton stops his car. Both officers get out of the car at this point. Once again, they didn't have to. *** [T]hey put themselves at a tremendous disadvantage,didn't they? *** Because now they're no longer protected. ***

* * *

All it takes is one person to step out from behind their car; one person to think the intersection is clear; or one person *** who works the late shift, they're taking their mother, son or daughter to work to be killed by this man. That's what these officers are trying to stop."

9

Again, the prosecutor noted defense counsel's "fantastical version of events in this case" in light of the other witnesses' testimony. Later, the prosecutor addressed defense counsel's cross-examination of Stapleton, and said:

> "just to illustrate how desperate the Defendant in this case is to demonize *** Stapleton. *** He was asked, did you hear yourself on the recording call [defendant] a piece of [s***]. Stapleton's answer was no. *** A couple questions later it's cleared up, *** that's *** Zettergren who says it. *** Well, that's never been touched since then, has it? Oh, okay. Never mind. It wasn't you who did that? Okay. Zettergren's not such a bad guy. We don't need to demonize him in this case ***."

He continued:

> "We're not here to decide whether or not what the police did was excessive. We're not here to decide whether or not we feel what the police did is okay. We're not here to decide where those shots were fired from. ***
>
> That's, again, going to a fantasy land and say all those shots were fired from the side of the car. It doesn't make a difference where any of those shots were fired from, because it's not really a part of this case. It's a very interesting distraction, but you won't see it in the Jury Instructions ***. It's got nothing to do with [defendant] trying to run over a police officer that night and acting like a complete fool when he was doing it and putting the entire community in danger.
> ***
> *** If you're being asked to judge their credibility, think *** about the officers and what they did that night and the choices they made [that] night. The

choices they made were to do their job, to show up for work, to respond to calls for service that they're sent to without asking why, without saying, I don't feel like it. And in this case with somebody like the Defendant out there who is gonna put them and everyone else in danger to stand up to that person, *** and say, no, you're not gonna do this, you have got to stop doing this, and I am going to risk my own safety in order to protect everyone.

That's what the police do. That's what *** Stapleton did that night. And where did it lead him? To this courtroom to sit here and be accused, be insulted and be degraded."

In closing, the prosecutor stated:

"I know you will go back in the jury room and consider the evidence and *** deliberate, but what I am gonna ask you not to do is to trick yourselves, is to fool yourselves into thinking there is something there that's not.

Don't think that just because we're here having a trial with this kind of evidence there really is no genuine issue as to whether or not this guy is guilty."

¶ 15 The court instructed the jury that it was their "duty to determine the facts and to determine them only from the evidence in this case." The court also instructed the jury "[o]nly you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them" and "[n]either opening statements nor closing arguments are evidence. Any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

¶ 16 The jury found defendant guilty of aggravated assault, aggravated fleeing or attempting to elude a peace officer, and DUI. The jury found defendant not guilty of attempted aggravated

11

battery. The court sentenced defendant to four years' imprisonment for aggravated assault and three years' imprisonment for aggravated fleeing or attempting to elude a peace officer, to be served concurrently. Defendant received 282 days of presentence custody credit toward his prison sentence. The court stated that it was entering "straight judgments of conviction" for criminal damage to property and DUI. The sentences for criminal damage to property and DUI merged with the sentences for aggravated assault and aggravated fleeing or attempting to elude a peace officer. The court also imposed a fine in the amount of $2,881. The court did not impose monetary credit toward fines for defendant's presentence custody. Defendant appealed.

¶ 17                                    II. ANALYSIS

¶ 18        Following the supreme court's latest ruling, we must determine defendant's remaining two issues, which include whether (1) the prosecutor committed error requiring reversal as a result of his comments during closing argument and (2) defendant is entitled to presentence monetary credit toward his fines pursuant to section 110-14(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/110-14(a) (West 2012)).

¶ 19                              A. Prosecutorial Error

¶ 20        Defendant argues that the prosecutor committed several errors during his closing argument. Specifically, defendant contends that the prosecutor (1) denigrated defense counsel, (2) made improper emotional appeals and attempts to bolster the credibility of testifying officers, and (3) improperly presumed defendant's guilt. Defendant concedes that these alleged errors are forfeited and asks for plain error review. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

¶ 21        The plain error doctrine allows a reviewing court to consider an otherwise forfeited error when "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People*

*v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). Under the first prong, to determine whether the evidence is close, "a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. The determination is not one of the sufficiency of the evidence but "the closeness of sufficient evidence." *Id.* ¶ 60. Evidence can be closely balanced when each party presents credible witnesses. *Id.* ¶ 63. Under the second prong, "[p]rejudice to the defendant is presumed because of the importance of the right involved." *People v. Herron*, 215 Ill. 2d 167, 187 (2005). The defendant bears the burden of persuasion under both prongs. *Id.* The first step of the plain error analysis is to determine whether a clear or obvious error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 22    "[P]rosecutors have wide latitude in the content of their closing arguments." *People v. Evans*, 209 Ill. 2d 194, 225 (2004). "[C]losing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context." *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007). The prosecutor may remark on the evidence and any fair and reasonable inference the evidence may yield, even if the suggested inference reflects negatively on defendant. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Prosecutors may respond to comments made by defense counsel that clearly invite a response and comment on the credibility of witnesses. *People v. Ammons*, 2021 IL App (3d) 150743, ¶ 52. "An argument that serves no purpose but to inflame the jury constitutes error." *Id.* ¶ 43. Additionally, a prosecutor may not make arguments seeking to "engender an 'us-versus-them' mentality." *People v. Johnson*, 208 Ill. 2d 53, 80 (2003). However, even if the prosecutor's comments exceed the bounds of proper argument, "the verdict must not be disturbed unless it can be said that the remark caused substantial prejudice to the defendant [citation], taking into account the content and context of the language, its relationship

13

to the evidence, and its effect on the defendant's right to a fair and impartial trial." (Internal quotation marks omitted.) *People v. Williams*, 192 Ill. 2d 548, 573 (2000).

¶ 23    First, defendant argues that the prosecutor denigrated defense counsel when he (1) commented on defendant's theory of the case, stating that it was "a fantasy," "fantastical," "fantasy land," and "[an] interesting distraction" and (2) asserted that counsel attempted to "demonize" Stapleton and put him "on trial," subjecting Stapleton to being "accused, *** insulted and *** degraded."

¶ 24    Initially, we note that the prosecutor's comments, characterizing defendant's theory of the case as "a fantasy" and "[an] interesting distraction," were not personally disparaging to defense counsel or accusations of unethical behavior but the State's conceptualization of defendant's theory of the case. Specifically, the prosecutor's comments were made directly in response to defense counsel's assertions that Stapleton exaggerated his testimony about defendant driving toward him and counsel's comments that if the jury thought Stapleton "lied" or "was acting to protect his own interests," the jury should not "believe him." Therefore, the statements were proper. See *Ammons*, 2021 IL App (3d) 150743, ¶ 52 (a prosecutor may properly respond "to the remarks made by defense counsel"); see also *Nicholas*, 218 Ill. 2d at 121-22 (a prosecutor may "urge the jury to administer the law without fear, when such argument is based upon competent and pertinent evidence").

¶ 25    However, the prosecutor's comments that defense counsel attempted to "demonize" Stapleton and put him "on trial," subjecting Stapleton to being "accused, *** insulted and *** degraded," suggested impropriety of counsel and in the manner with which he conducted himself at trial. While the State may comment on the evidence based on fair and reasonable inferences, these comments went too far and were improper. See *People v. Emerson*, 97 Ill. 2d 487, 498

14

(1983) (it is improper for a prosecutor to accuse defense counsel of trying to "dirty up the victim" (internal quotation marks omitted)).

¶ 26    Second, defendant alleges that the prosecutor made improper emotional appeals and attempts to bolster the credibility of testifying officers by repeatedly invoking Stapleton's "hero" status as a reason for the jury to find his testimony credible and find defendant guilty. Specifically, defendant highlights the prosecutor's rebuttal argument, referencing the nature of Stapleton's employment in that Stapleton was "working" when he received the report of criminal activity, he "didn't have to go," "[h]e didn't make any excuses," and "[h]e did his job" and that Stapleton did not "have to" exit his squad car and doing so put him at a "tremendous disadvantage."

¶ 27    While the record reflects that the prosecutor did not make *any* reference to Stapleton being a "hero," the prosecutor's comments about Stapleton could reasonably have induced the jury to trust the State's evidence over its own view due to Stapleton's employment. See *Johnson*, 208 Ill. 2d at 75-77, 80, 84 (the prosecutor's comments in closing argument describing a witness as a "hero" who "risked his life *** to serve and to protect the people" were improper emotional appeals intended to arouse the jury's passion and outrage and sought to engender an "us-versus-them" mentality, attributing to the court finding prosecutorial error (internal quotation marks omitted)). Additionally, the statements were more than a passing reference to Stapleton's role as an officer, and the State used his position to bolster its case. See *cf. Ammons*, 2021 IL App (3d) 150743, ¶¶ 51, 53 (the court found the prosecutor's argument that " 'if [the jury] found the defendant not guilty, they were turning their backs on the local police department, who were risking their lives for the jurors,' " amounted to a "single, passing reference" and was not error). Therefore, the State's comments were improper. See *Johnson*, 208 Ill. 2d at 75-77, 80, 84.

¶ 28    Third, defendant contends that the State improperly presumed guilt when it stated that there was not "one piece of evidence that exonerate[d] [defendant]" and asked the jury not to make assumptions about the evidence due to defendant demanding trial. In combination, these comments assert a negative inference against defendant simply exercising his constitutional right to a trial. See *People v. Libberton*, 346 Ill. App. 3d 912, 923 (2003). In doing so, the comments "penalize the defendant for the exercise" of that right and were improper. *Id.*

¶ 29    In sum, we find that the prosecutor made several improper closing remarks. Nevertheless, those comments are insufficient to amount to clear or obvious error. To constitute plain error, the remarks must have affected the fairness of defendant's trial and challenged the integrity of the judicial process. *Herron*, 215 Ill. 2d at 187. If this occurs, prejudice is presumed. *Id.* We note that a court may cure the prejudicial effect of improper comments made in closing arguments by instructing the jury that closing arguments are not evidence. *People v. Simms*, 192 Ill. 2d 348, 396 (2000). Absent evidence to the contrary, we presume that the jurors follow the instructions provided by the court. *People v. Green*, 2017 IL App (1st) 152513, ¶ 98.

¶ 30    Here, immediately after the prosecutor's comments in rebuttal, the court instructed the jury that the parties' arguments were not evidence, "[a]ny statement or argument made by the attorneys which is not based on the evidence should be disregarded," and that only the jurors were the "judges of the believability of the witnesses and of the weight to be given to the testimony of each of them." See *id.* (a circuit court may cure a prosecutor's improper remarks through its jury instructions). The court's instructions addressed the State's characterizations of evidence, defense counsel's theory of the case, and defendant's right to proceed to trial, and there is no evidence in the record to indicate that the jury disregarded the instructions. See *id.* More importantly, when viewed in context of the whole closing argument, the prosecutor's comments

16

did not constitute plain error as they were generally related to the evidence. See *Nicholas*, 218 Ill. 2d at 121 (a prosecutor may remark on the evidence and any fair and reasonable inference originating from the evidence).

¶ 31    Even if the State's improper comments were clear or obvious error, the error would not be reversible. On appeal, defendant only challenges his aggravated assault conviction, for which the evidence against defendant was overwhelming. See 720 ILCS 5/12-2(b)(4)(i), (c)(8) (West 2012) (aggravated assault requires the State to prove defendant "operat[ed] a motor vehicle in a manner which place[d] [an officer] in reasonable apprehension of being struck by the moving motor vehicle"); see also *Pacheco*, 2023 IL 127535, ¶ 86 (Rochford, J., specially concurring, joined by Holder White and O'Brien, JJ.) (describing the "case against defendant" as "strong").

¶ 32    At trial, Stapleton testified that after blocking defendant's vehicle between his squad car and a train, he exited his squad car and ordered defendant to stop his vehicle. Stapleton observed defendant's vehicle roll forward, as if defendant had removed his foot off the brake. Stapleton clarified that the vehicle did not move at "a high rate of speed" but "accelerated." Defendant's vehicle continued to move forward despite repeated orders to stop. Defendant's movement caused Stapleton to believe he was going to be hit by defendant's vehicle and killed. Stapleton was standing in front of defendant's vehicle when he discharged his weapon and moved out of the way of the vehicle afterward. The photographs show bullet holes in the hood and windshield of defendant's vehicle, supporting Stapleton's testimony that he stood in front of the vehicle as it drove toward him. Zettergren and McAbee's testimony corroborated Stapleton's version, where Zettergren recalled defendant's stopped vehicle facing them, rolling forward, and increasing speed, and McAbee observed defendant's vehicle driving slowly toward the officers while being ordered to stop. Additionally, the recordings corroborated Stapleton's testimony by reflecting

17

that, after defendant was ordered to stop his vehicle, the car accelerated, and the surveillance video showed Stapleton running away from defendant's vehicle.

¶ 33    Notably, D'Arcy, Kirk, and Delaney's testimony did not detract from Stapleton's testimony and credibility regarding whether he believed he would be imminently harmed by defendant's vehicle. Specifically, D'Arcy was not present when the aggravated assault occurred and provided no testimony regarding his personal observations of that part of the incident. Kirk's testimony was generally consistent with McAbee's testimony and differed only where Kirk believed he heard gunshots before defendant's vehicle moved. Moreover, the video corroborates the other witnesses' testimony, where Stapleton can be heard ordering defendant to stop his vehicle before the gunshots, lending to a reasonable inference that Stapleton gave those orders because defendant's vehicle was, in fact, moving. Delaney's testimony regarding the bullet trajectories did not weigh against Stapleton's credibility regarding where he stood when he discharged his firearm, since all the bullet holes were in the front windshield and hood of defendant's vehicle, and there was no indication that the bullets came from anyone but Stapleton. Importantly, none of the aforementioned testimony addressed whether Stapleton believed he would be imminently harmed by defendant's moving vehicle. See 720 ILCS 5/12-2(b)(4)(i), (c)(8) (West 2012).

¶ 34    Further, we do not believe that the jury finding defendant not guilty of attempted aggravated battery should factor into the closely balanced analysis of first-prong plain error. See *id.* § 8-4, 12-3.05(d)(4)(i) (when defendant knowingly attempts to commit battery against an individual that he knows to be a peace officer). The evidence showed that defendant's vehicle was moving, even if at a slow rate of speed. The jury was tasked with determining whether the manner in which defendant operated his vehicle placed *Stapleton* "in reasonable apprehension of

18

being struck by the moving motor vehicle." *Id.* § 12-2(b)(4)(i), (c)(8). Therefore, the jury's finding that *defendant* did not *intend* to hit Stapleton with his vehicle has no bearing on the jury's determination that Stapleton was "in reasonable apprehension of being struck by the moving motor vehicle." See *id.* Stated another way, as the counts required different findings related to defendant's mental state, the findings were consistent. See *cf. People v. Boyd*, 2021 IL App (1st) 182584, ¶ 57 ("Legally inconsistent verdicts occur when an essential element of each crime must, by the very nature of the verdicts, have been found to exist and to not exist even though the offenses arise out of the same set of facts." (Internal quotation marks omitted.)); see also *People v. Latham*, 31 Ill. App. 3d 66, 67 (1975) ("In law there is no inconsistency in verdicts of acquittal and conviction upon charges of crimes composed of different elements, but arising out of the same state of facts." (Internal quotation marks omitted.)).

¶ 35        Finally, defendant claims that the cumulative effect of the prosecutor's comments satisfies second-prong plain error and requires reversal. After careful review of the record, we find that the combination of these errors does not rise to the magnitude of reversible structural error under the second prong of the plain error doctrine. See *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009). As previously discussed, the prosecutor's improper argument possessed little prejudicial effect following the court's instructions. See *Green*, 2017 IL App (1st) 152513, ¶ 98. Additionally, the combined effect of these errors did not create a pervasive pattern of unfair prejudice such that a new trial is warranted. See *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). We find nothing in the trial transcript to suggest that the alleged errors caused substantial prejudice to defendant when considering the closing argument as a whole and in the context in which the statements were made. Moreover, none of the erroneous statements were of such magnitude that they eroded the integrity of the judicial process and infringed on defendant's right

19

to a fair trial or constituted a material factor in defendant's conviction. See *Wheeler*, 226 Ill. 2d at 123. Therefore, while some prosecutorial comments during closing arguments "exceed[ed] the bounds of proper argument," we will not disturb defendant's conviction in the absence of evidence of substantial prejudice. See *Williams*, 192 Ill. 2d at 572-73, 575 (the prosecutor's closing argument comments that the jury should not fear defendant, that defendant feared the jury because the jury " 'will hold him responsible,' " or ask the jury to " 'show the defendant that you are to be feared' " failed to rise to the level of substantial prejudice requiring reversal); see also *Johnson*, 208 Ill. 2d at 64 ("Absent reversible error, there can be no plain error.").

¶ 36                                    B. Presentence Monetary Credit

¶ 37        Defendant contends that, pursuant to section 110-14(a) of the Code, he is entitled to monetary custody credit for time spent in presentence custody in the amount of $1,410 to be applied against his court fine. Section 110-14(a) of the Code provides that "[a]ny person incarcerated on a bailable offense who does not supply bail and against whom a fine is levied on conviction of such offense shall be allowed a credit of $5 for each day so incarcerated upon application of the defendant." 725 ILCS 5/110-14(a) (West 2012). The $5-per-day credit is available to defendants who also receive presentence custody credit toward their prison sentence. *People v. Hare*, 119 Ill. 2d 441, 452 (1988).

¶ 38        Here, defendant spent 282 days in presentence custody awaiting trial. The court used defendant's presentence custody toward his prison sentence but did not apply defendant's $5 presentence custody credit toward his fine. The court imposed a $2,881 fine. The State concedes that defendant is entitled to presentence credit in the amount of $1,410 toward his $2,881 fine. We accept the State's confession of error and remand to the circuit court to apply defendant's monetary presentence custody credit in the amount of $1,410 to his fine.

20

¶ 39                                    III. CONCLUSION

¶ 40          The judgment of the circuit court of Will County is affirmed and remanded with

directions to correct the sentencing judgment to reflect the appropriate presentence monetary

credit.

¶ 41          Affirmed and remanded with directions.

*People v. Pacheco*, 2025 IL App (3d) 150880-C

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 12-CF-1799; the Hon. Carla Alessio-Policandriotes, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Peter A. Carusona, and Emily A. Koza, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | James Glasgow, State's Attorney, of Joliet (Patrick Delfino, David J. Robinson, and Luke McNeill, State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |